(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BRUMFIELD *v.* CAIN, WARDEN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 13–1433. Argued March 30, 2015 —Decided June 18, 2015

Petitioner Kevan Brumfield was convicted of murder in a Louisiana court and sentenced to death before this Court held that the Eighth Amendment prohibits execution of the intellectually disabled, *Atkins* v. *Virginia*, 536 U. S. 304. Implementing *Atkins*' mandate, see *id.,* at 317, the Louisiana Supreme Court determined that an evidentiary hearing is required when a defendant "provide[s] objective factors" sufficient to raise a "'a reasonable ground'" to believe that he has an intellectual disability, which the court defined as "(1) subaverage intelligence, as measured by objective standardized IQ tests; (2) significant impairment in several areas of adaptive skills; and (3) manifestations of this neuro-psychological disorder in the developmental stage." *State v. Williams,* 2001–1650 (La. 11/1/02), 831 So. 2d 835, 857, 861, 854.

Soon after the *Williams* decision, Brumfield amended his pending state postconviction petition to raise an *Atkins* claim. Seeking an evidentiary hearing, he pointed to evidence introduced at sentencing that he had an IQ of 75, had a fourth-grade reading level, had been prescribed numerous medications and treated at psychiatric hospitals as a child, had been identified as having a learning disability, and had been placed in special education classes. The trial court dismissed Brumfield's petition without holding a hearing or granting funds to conduct additional investigation. Brumfield subsequently sought federal habeas relief. The District Court found that the state court's rejection of Brumfield's claim was both "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by" this Court and "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U. S. C. §§2254(d)(1), (2). The court went on to

determine that Brumfield was intellectually disabled. The Fifth Circuit found that Brumfield's petition failed to satisfy either of §2254(d)'s requirements and reversed.

*Held*: Because Brumfield satisfied §2254(d)(2)'s requirements, he was entitled to have his *Atkins* claim considered on the merits in federal court. Pp. 6–19.

(a) The two underlying factual determinations on which the state trial court's decision was premised—that Brumfield's IQ score was inconsistent with a diagnosis of intellectual disability and that he presented no evidence of adaptive impairment—were unreasonable under §2254(d)(2). Because that standard is satisfied, the Court need not address §2254(d)(1). Pp. 6–17.

(1) Expert trial testimony that Brumfield scored a 75 on an IQ test is entirely consistent with intellectual disability. Every IQ score has a margin of error. Accounting for that margin of error, the sources on which the *Williams* court relied in defining subaverage intelligence describe a score of 75 as consistent with an intellectual disability diagnosis. There was no evidence presented to the trial court of any other IQ test that was sufficiently rigorous to preclude the possibility that Brumfield possessed subaverage intelligence. Pp. 8–11.

(2) The state-court record contains sufficient evidence to suggest that Brumfield would meet the criteria for adaptive impairment. Under the test most favorable to the State, an individual like Brumfield must show a "substantial functional limitation" in three of six "areas of major life activity." *Williams*, 831 So. 2d, at 854. Brumfield—who was placed in special education classes at an early age, was suspected of having a learning disability, and can barely read at a fourth-grade level—would seem to be deficient in two of those areas: "[u]nderstanding and use of language" and "[l]earning." *Ibid*. His low birth weight, his commitment to mental health facilities at a young age, and officials' administration of antipsychotic and sedative drugs to him at that time all indicate that he may well have had significant deficits in at least one of the remaining four areas. In light of that evidence, the fact that the record contains some contrary evidence cannot be said to foreclose all reasonable doubt as to his intellectual disability. And given that Brumfield's trial occurred before *Atkins*, the trial court should have taken into account that the evidence before it was sought and introduced at a time when Brumfield's intellectual disability was not at issue. Pp. 11–17.

(b) The State's two additional arguments are rejected. Because the State did not press below the theory that §2254(e)(1) supplies the governing standard when evaluating whether a habeas petitioner has satisfied §2254(d)(2)'s requirements, that issue is not addressed here.

Syllabus

And because the state trial court made no finding that Brumfield had failed to produce evidence suggesting he could meet the "manifestations . . . in the developmental stage" requirement for intellectual disability, there is no determination on that point to which a federal court must defer in assessing whether Brumfield satisfied §2254(d). In any event, the state court record contained ample evidence creating a reasonable doubt as to whether Brumfield's disability manifested before adulthood. Pp. 17–18.

744 F. 3d 918, vacated and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in all but Part I–C of which ROBERTS, C. J., and SCALIA and ALITO, JJ., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–1433

### KEVAN BRUMFIELD, PETITIONER *v.* BURL CAIN, WARDEN

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT*

[June 18, 2015]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In *Atkins* v. *Virginia*, 536 U. S. 304 (2002), this Court recognized that the execution of the intellectually disabled contravenes the Eighth Amendment's prohibition on cruel and unusual punishment. After *Atkins* was decided, petitioner, a Louisiana death-row inmate, requested an opportunity to prove he was intellectually disabled in state court. Without affording him an evidentiary hearing or granting him time or funding to secure expert evidence, the state court rejected petitioner's claim. That decision, we hold, was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U. S. C. §2254(d)(2). Petitioner was therefore entitled to have his *Atkins* claim considered on the merits in federal court.

## I

Petitioner Kevan Brumfield was sentenced to death for the 1993 murder of off-duty Baton Rouge police officer Betty Smothers. Brumfield, accompanied by another individual, shot and killed Officer Smothers while she was escorting the manager of a grocery store to the bank.

At the time of Brumfield's trial, this Court's precedent permitted the imposition of the death penalty on intellectually disabled persons. See *Penry* v. *Lynaugh*, 492 U. S. 302, 340 (1989) (opinion of O'Connor, J.). But in *Atkins*, this Court subsequently held that "in light of . . . 'evolving standards of decency,'" the Eighth Amendment "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." 536 U. S., at 321 (quoting *Ford* v. *Wainwright*, 477 U. S. 399, 405 (1986)).[1] Acknowledging the "disagreement" regarding how to "determin[e] which offenders are in fact" intellectually disabled, the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U. S., at 317 (internal quotation marks omitted; some alterations in original).

The Louisiana Supreme Court took up the charge of implementing *Atkins*' mandate in *State* v. *Williams*, 2001–1650 (La. 11/1/02), 831 So. 2d 835. The court held that "a diagnosis of mental retardation has three distinct components: (1) subaverage intelligence, as measured by objective standardized IQ tests; (2) significant impairment in several areas of adaptive skills; and (3) manifestations of this neuro-psychological disorder in the developmental stage." *Id.*, at 854 (relying on, *inter alia*, American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports (10th ed. 2002) (AAMR), and American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (rev. 4th ed. 2000) (DSM–IV)); see also La. Code Crim. Proc. Ann., Art. 905.5.1(H)(1) (West Cum. Supp. 2015) (subsequently enacted statute governing *Atkins* claims

---

[1] While this Court formerly employed the phrase "mentally retarded," we now "us[e] the term 'intellectual disability' to describe the identical phenomenon." *Hall* v. *Florida*, 572 U. S. ___, ___ (2014) (slip op., at 2).

adopting the three *Williams* criteria). The *Williams* court also clarified that "not everyone faced with a death penalty sentence" would "automatically be entitled to a post-*Atkins* hearing"; rather, it would "be an individual defendant's burden to provide objective factors that will put at issue the fact of mental retardation." 831 So. 2d, at 857. Borrowing from the state statutory standard for determining when a pretrial competency inquiry is necessary, the court held that an *Atkins* evidentiary hearing is required when an inmate has put forward sufficient evidence to raise a "'reasonable ground'" to believe him to be intellectually disabled. See *id.*, at 861; see also *id.*, at 858, n. 33 (characterizing the requisite showing as one raising a "'reasonable doubt'").[2]

Shortly after the *Williams* decision, Brumfield amended his pending state postconviction petition to raise an *Atkins* claim. He sought an evidentiary hearing on the issue, asserting that his case was "accompanied by a host of objective facts which raise the issue of mental retardation." App. 203a.

In support, Brumfield pointed to mitigation evidence introduced at the sentencing phase of his trial. He focused on the testimony of three witnesses in particular: his mother; Dr. Cecile Guin, a social worker who had compiled a history of Brumfield by consulting available records and conducting interviews with family members and teachers; and Dr. John Bolter, a clinical neuropsychologist who had performed a number of cognitive tests on Brumfield. A

──────────

[2] Although Louisiana subsequently adopted a statute governing the adjudication of *Atkins* claims, see La. Code Crim. Proc. Ann., Art. 905.5.1 (West Cum. Supp. 2015), the parties agree that the procedures set forth in *Williams* governed this case. See Brief for Petitioner 26, n. 7; Brief for Respondent 13, n. 6; see also *State* v. *Dunn*, 2007–0878 (La. 1/25/08), 974 So. 2d 658, 662 (holding that this statute does not "establis[h] a procedure to be used for *Atkins* hearings conducted post-trial and/or post-sentencing").

psychologist, Dr. Brian Jordan, had also examined Brumfield and prepared a report, but did not testify at trial. Brumfield contended that this evidence showed, among other things, that he had registered an IQ score of 75, had a fourth-grade reading level, had been prescribed numerous medications and treated at psychiatric hospitals as a child, had been identified as having some form of learning disability, and had been placed in special education classes. See *id.*, at 203a–204a. Brumfield further requested "all the resources necessary to the proper presentation of his case," asserting that until he was able to "retain the services of various experts," it would be "premature for [the court] to address [his] claims." *Id.*, at 207a.

Without holding an evidentiary hearing or granting funds to conduct additional investigation, the state trial court dismissed Brumfield's petition. With respect to the request for an *Atkins* hearing, the court stated:

"I've looked at the application, the response, the record, portions of the transcript on that issue, and the evidence presented, including Dr. Bolter's testimony, Dr. Guinn's [*sic*] testimony, which refers to and discusses Dr. Jordan's report, and based on those, since this issue—there was a lot of testimony by all of those in Dr. Jordan's report.

"Dr. Bolter in particular found he had an IQ of over—or 75. Dr. Jordan actually came up with a little bit higher IQ. I do not think that the defendant has demonstrated impairment based on the record in adaptive skills. The doctor testified that he did have an anti-social personality or sociopath, and explained it as someone with no conscience, and the defendant hadn't carried his burden placing the claim of mental retardation at issue. Therefore, I find he is not entitled to that hearing based on all of those things that I just set out." App. to Pet. for Cert. 171a–172a.

After the Louisiana Supreme Court summarily denied his application for a supervisory writ to review the trial court's ruling, *Brumfield* v. *State*, 2004–0081 (La. 10/29/04), 885 So. 2d 580, Brumfield filed a petition for habeas corpus in federal court, again pressing his *Atkins* claim. Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Brumfield could secure relief only if the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U. S. C. §§2254(d)(1), (2).

The District Court found that both of these requirements had been met. 854 F. Supp. 2d 366, 383–384 (MD La. 2012). First, the District Court held that denying Brumfield an evidentiary hearing without first granting him funding to develop his *Atkins* claim "represented an unreasonable application of then-existing due process law," thus satisfying §2254(d)(1). *Id.*, at 379. Second, and in the alternative, the District Court found that the state court's decision denying Brumfield a hearing "suffered from an unreasonable determination of the facts in light of the evidence presented in the state habeas proceeding in violation of §2254(d)(2)." *Ibid.*

The District Court further determined Brumfield to be intellectually disabled based on the extensive evidence it received during an evidentiary hearing. *Id.*, at 406; see *Cullen* v. *Pinholster*, 563 U. S. 170, ___ (2011) (slip op., at 13) (recognizing that federal habeas courts may "take new evidence in an evidentiary hearing" when §2254(d) does not bar relief). This evidence included the results of various IQ tests—which, when adjusted to account for measurement errors, indicated that Brumfield had an IQ score between 65 and 70, 854 F. Supp. 2d, at 392—testimony

and expert reports regarding Brumfield's adaptive behavior and "significantly limited conceptual skills," *id.*, at 401, and proof that these deficits in intellectual functioning had exhibited themselves before Brumfield reached adulthood, *id.*, at 405. Thus, the District Court held, Brumfield had "demonstrated he is mentally retarded as defined by Louisiana law" and was "ineligible for execution." *Id.*, at 406.

The United States Court of Appeals for the Fifth Circuit reversed. 744 F. 3d 918, 927 (2014). It held that Brumfield's federal habeas petition failed to satisfy either of §2254(d)'s requirements. With respect to the District Court's conclusion that the state court had unreasonably applied clearly established federal law, the Fifth Circuit rejected the notion that any of this Court's precedents required a state court to grant an *Atkins* claimant the funds necessary to make a threshold showing of intellectual disability. See 744 F. 3d, at 925–926. As for the District Court's holding that the state court's decision rested on an unreasonable determination of the facts, the Fifth Circuit declared that its "review of the record persuad[ed it] that the state court did not abuse its discretion when it denied Brumfield an evidentiary hearing." *Id.*, at 926. Having found that Brumfield's petition failed to clear §2254(d)'s hurdle, the Fifth Circuit did not review the District Court's conclusion that Brumfield is, in fact, intellectually disabled. See *id.*, at 927, and n. 8.

We granted certiorari on both aspects of the Fifth Circuit's §2254(d) analysis, 574 U. S. ___ (2014), and now vacate its decision and remand for further proceedings.

## II

Before this Court, Brumfield advances both of the rationales on which the District Court relied in holding §2254(d) to be satisfied. Because we agree that the state court's rejection of Brumfield's request for an *Atkins* hear-

ing was premised on an "unreasonable determination of the facts" within the meaning of §2254(d)(2), we need not address whether its refusal to grant him expert funding, or at least the opportunity to seek *pro bono* expert assistance to further his threshold showing, reflected an "unreasonable application of . . . clearly established Federal law," §2254(d)(1).

In conducting the §2254(d)(2) inquiry, we, like the courts below, "look through" the Louisiana Supreme Court's summary denial of Brumfield's petition for review and evaluate the state trial court's reasoned decision refusing to grant Brumfield an *Atkins* evidentiary hearing. See *Johnson* v. *Williams*, 568 U. S. ___, ___, n. 1 (2013) (slip op., at 6, n. 1); *Ylst* v. *Nunnemaker*, 501 U. S. 797, 806 (1991). Like Brumfield, we do not question the propriety of the legal standard the trial court applied, and presume that a rule according an evidentiary hearing only to those capital defendants who raise a "reasonable doubt" as to their intellectual disability is consistent with our decision in *Atkins*. Instead, we train our attention on the two underlying factual determinations on which the trial court's decision was premised—that Brumfield's IQ score was inconsistent with a diagnosis of intellectual disability and that he had presented no evidence of adaptive impairment. App. to Pet. for Cert. 171a–172a.[3]

―――――――

[3] The dissent accuses us of "recasting legal determinations as factual ones." *Post*, at 15 (opinion of THOMAS, J.) (emphasis deleted) (hereinafter the dissent). But we subject these determinations to review under §2254(d)(2) instead of §2254(d)(1) because we are concerned here not with the adequacy of the procedures and standards the state court applied in rejecting Brumfield's *Atkins* claim, but with the underlying factual conclusions the court reached when it determined that the record evidence was inconsistent with intellectual disability. See *Maggio* v. *Fulford*, 462 U. S. 111, 117 (1983) (*per curiam*) (reviewing under the predecessor to §2254(d)(2) the "factual conclusions" underlying a state court's conclusion that a criminal defendant had raised no doubt as to his competency to stand trial). We look to Louisiana case

We may not characterize these state-court factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Wood* v. *Allen*, 558 U. S. 290, 301 (2010). Instead, §2254(d)(2) requires that we accord the state trial court substantial deference. If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Ibid.* (quoting *Rice* v. *Collins*, 546 U. S. 333, 341–342 (2006)). As we have also observed, however, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Miller-El* v. *Cockrell*, 537 U. S. 322, 340 (2003). Here, our examination of the record before the state court compels us to conclude that both of its critical factual determinations were unreasonable.

A

The state trial court's rejection of Brumfield's request for an *Atkins* hearing rested, first, on Dr. Bolter's testimony that Brumfield scored 75 on an IQ test and may have scored higher on another test. See App. to Pet. for Cert. 171a. These scores, the state court apparently believed, belied the claim that Brumfield was intellectually disabled because they necessarily precluded any possibility that he possessed subaverage intelligence—the first of the three criteria necessary for a finding of intellectual disability.

———————

law only because it provides the framework in which these factual determinations were made, and makes clear that the state court's decision rejecting Brumfield's *Atkins* claim was premised on those determinations. And we apply §2254(d)(2) at the behest of the State itself, which invokes that provision (and §2254(e)(1)'s similarly fact-focused standard) in contending that AEDPA bars Brumfield's *Atkins* claim, and characterizes the determinations we review here as "highly factual." Brief for Respondent 25.

But in fact, this evidence was entirely consistent with intellectual disability.

To qualify as "significantly subaverage in general intellectual functioning" in Louisiana, "one must be more than two standard deviations below the mean for the test of intellectual functioning." *Williams*, 831 So. 2d, at 853 (internal quotation marks omitted). On the Wechsler scale for IQ—the scale employed by Dr. Bolter—that would equate to a score of 70 or less. See *id.*, at 853–854, n. 26.

As the Louisiana Supreme Court cautioned in *Williams*, however, an IQ test result cannot be assessed in a vacuum. In accord with sound statistical methods, the court explained: "[T]he assessment of intellectual functioning through the primary reliance on IQ tests must be tempered with attention to possible errors in measurement." *Ibid.* Thus, *Williams* held, "[a]lthough Louisiana's definition of significantly subaverage intellectual functioning does not specifically use the word 'approximately,' because of the SEM [(standard error of measurement)], any IQ test score has a margin of error and is only a factor in assessing mental retardation." *Id.*, at 855, n. 29.

Accounting for this margin of error, Brumfield's reported IQ test result of 75 was squarely in the range of potential intellectual disability. The sources on which *Williams* relied in defining subaverage intelligence both describe a score of 75 as being consistent with such a diagnosis. See AAMR, at 59; DSM–IV, at 41–42; see also *State* v. *Dunn*, 2001–1635 (La. 5/11/10), 41 So. 3d 454, 470 ("The ranges associated with the two scores of 75 brush the threshold score for a mental retardation diagnosis").[4] Relying on

_____

[4] The dissent insists that we have ignored language in *Williams* establishing that "the requisite IQ could range 'from 66 to 74.'" *Post*, at 18 (quoting *Williams*, 831 So. 2d, at 854, n. 26). But the dissent wrenches the quoted language out of context. The *Williams* Court actually said: "One SEM is plus or minus a specified number of IQ

similar authorities, this Court observed in *Atkins* that "an
IQ between 70 and 75 or lower . . . is typically considered
the cutoff IQ score for the intellectual function prong of
the mental retardation definition."  536 U. S., at 309, n. 5.
Indeed, in adopting these definitions, the Louisiana Su-
preme Court anticipated our holding in *Hall* v. *Florida,*
572 U. S. ___ (2014), that it is unconstitutional to foreclose
"all further exploration of intellectual disability" simply
because a capital defendant is deemed to have an IQ above
70.  *Id.*, at ___ (slip op., at 1); see also *id.*, at ___ (slip op.,
at 12) ("For professionals to diagnose—and for the law
then to determine—whether an intellectual disability
exists once the SEM applies and the individual's IQ score
is 75 or below the inquiry would consider factors indicat-
ing whether the person had deficits in adaptive function-
ing").  To conclude, as the state trial court did, that Brum-
field's reported IQ score of 75 somehow demonstrated that
he could not possess subaverage intelligence therefore
reflected an unreasonable determination of the facts.

Nor was there evidence of any higher IQ test score that
could render the state court's determination reasonable.
The state court claimed that Dr. Jordan, who examined
Brumfield but never testified at trial, "came up with a
little bit higher IQ."  App. to Pet. for Cert. 171a.  At trial,
the existence of such a test score was mentioned only
during the cross-examination of Dr. Bolter, who had sim-
ply acknowledged the following: "Dr. Jordan rated his
intelligence just a little higher than I did.  But Dr. Jordan
also only did a screening test and I gave a standardized
measure of intellectual functioning."  App. 133a.  And in
fact, Dr. Jordan's written report provides no IQ score.  See

─────────────

points.  Thus, an IQ of 70 could range from 66 to 74 assuming an SEM
of 4."  831 So. 2d, at 854, n. 26.  *Williams* did not thereby hold that an
SEM of 4, and a resultant range of 66 to 74, must be used; it was
simply using this example to illustrate the concept of SEM.

*id.*, at 429a.[5]  The state court therefore could not reasonably infer from this evidence that any examination Dr. Jordan had performed was sufficiently rigorous to preclude definitively the possibility that Brumfield possessed subaverage intelligence.  See *State* v. *Dunn*, 2001–1635 (La. 11/1/02), 831 So. 2d 862, 886, n. 9 (ordering *Atkins* evidentiary hearing even though "prison records indicate[d]" the defendant had an "'estimated IQ of 76,'" emphasizing testimony that prison officials "did not do the formal IQ testing").

## B

The state court's refusal to grant Brumfield's request for an *Atkins* evidentiary hearing rested, next, on its conclusion that the record failed to raise any question as to Brumfield's "impairment . . . in adaptive skills."  App. to Pet. for Cert. 171a.  That determination was also unreasonable.

The adaptive impairment prong of an intellectual disability diagnosis requires an evaluation of the individual's ability to function across a variety of dimensions.  The Louisiana Supreme Court in *Williams* described three separate sets of criteria that may be utilized in making this assessment.  See 831 So. 2d, at 852–854.  Although Louisiana courts appear to utilize all three of these tests in evaluating adaptive impairment, see *Dunn*, 41 So. 3d, at 458–459, 463, for the sake of simplicity we will assume that the third of these tests, derived from Louisiana statu-

_____

[5] There is some question whether Dr. Jordan's report, which was introduced in federal habeas proceedings, was ever entered into the state-court record.  See 854 F. Supp. 2d 366, 380, n. 13 (MD La. 2012) (accepting counsel's representation that the report was not in the state-court record); but see Tr. of Oral Arg. 50 (State's counsel asserting that it was).  We see no need to resolve this dispute, though we note that the report is not currently contained in the state-court record lodged with the District Court.

tory law, governed here, as it appears to be the most favorable to the State.[6] Under that standard, an individual may be intellectually disabled if he has "substantial functional limitations in three or more of the following areas of major life activity: (i) Self-care. (ii) Understanding and use of language. (iii) Learning. (iv) Mobility. (v) Self-direction. (vi) Capacity for independent living." *Williams*, 831 So. 2d, at 854 (quoting then La. Rev. Stat. Ann. §28:381(12) (repealed 2005)).

The record before the state court contained sufficient evidence to raise a question as to whether Brumfield met these criteria. During the sentencing hearing, Brumfield's mother testified that Brumfield had been born prematurely at a very low birth weight. App. 28a. She also recounted that he had been taken out of school in the fifth grade and hospitalized due to his behavior, and recalled an incident in which he suffered a seizure. *Id.*, at 34a–38a, 41a, 47a.

Social worker Dr. Guin elaborated on this testimony, explaining that Brumfield's low birth weight indicated "that something ha[d] gone wrong during the pregnancy," that medical records suggested Brumfield had "slower responses than normal babies," and that "they knew that something was wrong at that point." *Id.*, at 75a–76a. Dr. Guin also confirmed that, beginning in fifth grade, Brumfield had been placed in special classes in school and in multiple mental health facilities, and had been prescribed

——————

[6] The other two standards set forth in *Williams* were: the AAMR criteria, which require "'limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work,'" 831 So. 2d, at 852, n. 22; and the DSM–IV criteria, which similarly require "'significant limitations'" in "'at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety,'" *id.*, at 853, n. 25.

antipsychotics and sedatives. *Id.*, at 89a, 93a–94a.[7] Moreover, one report Dr. Guin reviewed from a facility that treated Brumfield as a child "questioned his intellectual functions," and opined that "he probably had a learning disability related to some type of slowness in motor development, some type of physiological [problem]." *Id.*, at 89a. Dr. Guin herself reached a similar conclusion, stating that Brumfield "obviously did have a physiologically linked learning disability that he was born with," and that his "basic problem was that he . . . could not process information." *Id.*, at 90a, 98a.

Finally, Dr. Bolter, who had performed "a comprehensive battery of tests," confirmed that Brumfield had a "borderline general level of intelligence." *Id.*, at 127a–128a. His low intellect manifested itself in a fourth-grade reading level—and he reached that level, Dr. Bolter elaborated, only with respect to "simple word recognition," and "not even comprehension." *Id.*, at 128a; see also *id.*, at 134a. In a written report submitted to the state court, Dr. Bolter further noted that Brumfield had deficiencies "frequently seen in individuals with a history of learning disabilities," and "clearly" had "learning characteristics that make it more difficult for him to acquire new information." *Id.*, at 418a, 420a. Dr. Bolter also testified that Brumfield's low birth weight had "place[d] him [at] a risk of some form of potential neurological trauma," and affirmed that the medications administered to Brumfield as a child were generally reserved for "severe cases." *Id.*, at 130a, 132a.

All told, then, the evidence in the state-court record provided substantial grounds to question Brumfield's

—————

[7] While the dissent contends that the record shows Brumfield's placement in special education classes was simply due to his misbehavior, *post*, at 19, Dr. Guin testified that Brumfield's behavioral problems were in part a function of a learning disability, see App. 86a.

adaptive functioning. An individual, like Brumfield, who was placed in special education classes at an early age, was suspected of having a learning disability, and can barely read at a fourth-grade level, certainly would seem to be deficient in both "[u]nderstanding and use of language" and "[l]earning"—two of the six "areas of major life activity" identified in *Williams*. 831 So. 2d, at 854. And the evidence of his low birth weight, of his commitment to mental health facilities at a young age, and of officials' administration of antipsychotic and sedative drugs to him at that time, all indicate that Brumfield may well have had significant deficits in at least one of the remaining four areas. See *ibid.*

In advancing its contrary view of the record, the state court noted that Dr. Bolter had described Brumfield as someone with "an antisocial personality." App. 127a; see App. to Pet. for Cert. 171a. The relevance of this diagnosis is, however, unclear, as an antisocial personality is not inconsistent with any of the above-mentioned areas of adaptive impairment, or with intellectual disability more generally. The DSM–IV—one of the sources on which the *Williams* court relied in defining intellectual disability— provides: "The diagnostic criteria for Mental Retardation do not include an exclusion criterion; therefore, the diagnosis should be made . . . regardless of and in addition to the presence of another disorder." DSM–IV, at 47; see also AAMR, at 172 (noting that individuals with intellectual disability also tend to have a number of other mental health disorders, including personality disorders).

To be sure, as the dissent emphasizes, *post*, at 13–14, 18, other evidence in the record before the state court may have cut against Brumfield's claim of intellectual disability. Perhaps most significant, in his written report Dr. Bolter stated that Brumfield "appears to be normal from a neurocognitive perspective," with a "normal capacity to learn and acquire information when given the opportunity

for repetition," and "problem solving and reasoning skills" that were "adequate." App. 421a. Likewise, the underlying facts of Brumfield's crime might arguably provide reason to think that Brumfield possessed certain adaptive skills, as the murder for which he was convicted required a degree of advanced planning and involved the acquisition of a car and guns. But cf. AAMR, at 8 (intellectually disabled persons may have "strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation").

It is critical to remember, however, that in seeking an evidentiary hearing, Brumfield was not obligated to show that he was intellectually disabled, or even that he would likely be able to prove as much. Rather, Brumfield needed only to raise a "reasonable doubt" as to his intellectual disability to be entitled to an evidentiary hearing. See *Williams*, 831 So. 2d, at 858, n. 33. The Louisiana Supreme Court's decision in *Williams* illustrated how low the threshold for an evidentiary hearing was intended to be: There, the court held that the defendant was entitled to a hearing on his *Atkins* claim notwithstanding the fact that "the defense's own expert testified unequivocally, at both the guilt and penalty phases of trial, that [the] defendant is not mentally retarded," an assessment "based on the fact that [the] defendant [was] not deficient in adaptive functioning." 831 So. 2d, at 855; see also *Dunn*, 831 So. 2d, at 885, 887 (ordering hearing despite expert testimony that the defendant "had never been identified as a child who was a slow learner," and had "received college credit for courses completed during his incarceration"). Similarly, in light of the evidence of Brumfield's deficiencies, none of the countervailing evidence could be said to foreclose all reasonable doubt. An individual who points to evidence that he was at risk of "neurological trauma" at birth, was diagnosed with a learning disability and placed in special

education classes, was committed to mental health facilities and given powerful medication, reads at a fourth-grade level, and simply cannot "process information," has raised substantial reason to believe that he suffers from adaptive impairments.

That these facts were alone sufficient to raise a doubt as to Brumfield's adaptive impairments is all the more apparent given that Brumfield had not yet had the opportunity to develop the record for the purpose of proving an intellectual disability claim. At his pre-*Atkins* trial, Brumfield had little reason to investigate or present evidence relating to intellectual disability. In fact, had he done so at the penalty phase, he ran the risk that it would "enhance the likelihood . . . future dangerousness [would] be found by the jury." *Atkins*, 536 U. S., at 321. Thus, given that the evidence from trial provided good reason to think Brumfield suffered from an intellectual disability, there was even greater cause to believe he might prove such a claim in a full evidentiary hearing. Indeed, the Louisiana Supreme Court had made clear that a capital defendant in Brumfield's position should be accorded this additional benefit of the doubt when it defined the standard for assessing whether a hearing is required. Echoing *Atkins*' observation that penalty-phase evidence of intellectual disability can be a "two-edged sword," *ibid.*, *Williams* noted that where a trial "was conducted prior to *Atkins*," the defense's "trial strategy may have been to shift the focus away from any diagnosis of mental retardation." 831 So. 2d, at 856, n. 31. For that reason, the *Williams* court considered the fact that the defendant "ha[d] not had the issue of mental retardation put before the fact finder in light of the *Atkins* restriction on the death penalty" as a factor supporting the requisite threshold showing that "entitled [him] to an evidentiary hearing." *Id.*, at 857; accord, *Dunn*, 831 So. 2d, at 886. Here, the state trial court should have taken into account that the evidence

before it was sought and introduced at a time when Brumfield's intellectual disability was not at issue. The court's failure to do so resulted in an unreasonable determination of the facts.

## III
### A

Urging affirmance of the decision below, the State advances two additional arguments that we need discuss only briefly.

First, the State suggests that rather than being evaluated pursuant to §2254(d)(2)'s "unreasonable determination of the facts" standard, Brumfield's attack on the state trial court's decision should instead be "'reviewed under the arguably more deferential standard set out in §2254(e)(1).'" Brief for Respondent 30 (quoting *Wood*, 558 U. S., at 301).[8] We have not yet "defined the precise relationship between §2254(d)(2) and §2254(e)(1)," *Burt* v. *Titlow*, 571 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 5), and we need not do so here. The State did not press below the theory that §2254(e)(1) supplies the governing standard when a court evaluates whether a habeas petitioner has satisfied §2254(d)(2)'s requirements, the Fifth Circuit did not address that possibility, and the State in its brief in opposition to certiorari failed to advance any specific argument that the decision below could be supported by invocation of that statutory provision. See Brief in Opposition 60–64. The argument is therefore "properly 'deemed waived.'" *Granite Rock Co.* v. *Teamsters*, 561 U. S. 287, 306 (2010) (quoting this Court's Rule 15.2).

———————

[8] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Second, the State contends that Brumfield's request for an *Atkins* hearing was properly rejected because the record evidence failed to show that Brumfield's intellectual deficiencies manifested while he was in the "developmental stage"—that is, before he reached adulthood. *Williams*, 831 So. 2d, at 854. But the state trial court never made any finding that Brumfield had failed to produce evidence suggesting he could meet this age-of-onset requirement. There is thus no determination on that point to which a federal court must defer in assessing whether Brumfield satisfied §2254(d). See *Panetti* v. *Quarterman*, 551 U. S. 930, 953–954 (2007); compare, *e.g.*, *Wiggins* v. *Smith*, 539 U. S. 510, 534 (2003) (reviewing *de novo* the question whether petitioner had suffered prejudice where state court's reasoned decision rejecting claim under *Strickland* v. *Washington*, 466 U. S. 668 (1984), was premised solely on conclusion that attorney's performance had not been constitutionally deficient), with *Harrington* v. *Richter*, 562 U. S. 86, 98 (2011) (requiring federal habeas court to defer to hypothetical reasons state court might have given for rejecting federal claim where there is no "opinion explaining the reasons relief has been denied"). In any event, the state-court record contained ample evidence creating a reasonable doubt as to whether Brumfield's disability manifested before adulthood: Both Dr. Guin and Dr. Bolter testified at length about Brumfield's intellectual shortcomings as a child and their possible connection to his low birth weight. If Brumfield presented sufficient evidence to suggest that he was intellectually limited, as we have made clear he did, there is little question that he also established good reason to think that he had been so since he was a child.

### B

Finally, we offer a few additional words in response to JUSTICE THOMAS' dissent. We do not deny that Brum-

field's crimes were terrible, causing untold pain for the victims and their families. But we are called upon today to resolve a different issue. There has already been one death that society rightly condemns. The question here is whether Brumfield cleared AEDPA's procedural hurdles, and was thus entitled to a hearing to show that he so lacked the capacity for self-determination that it would violate the Eighth Amendment to permit the State to impose the "law's most severe sentence," *Hall*, 572 U. S., at \_\_\_ (slip op., at 7), and take his life as well. That question, and that question alone, we answer in the affirmative.

\*    \*    \*

We hold that Brumfield has satisfied the requirements of §2254(d). The judgment of the United States Court of Appeals for the Fifth Circuit is therefore vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1433

_____

## KEVAN BRUMFIELD, PETITIONER *v.* BURL CAIN, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2015]

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE ALITO join as to all but Part I–C, dissenting.

Federal collateral review of state convictions interrupts the enforcement of state criminal laws and undermines the finality of state-court judgments. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) addresses that interference by constraining the ability of federal courts to grant relief to state prisoners. Today, the Court oversteps those limits in a decision that fails to respect the Louisiana state courts and our precedents. I respectfully dissent.

I

This case is a study in contrasts. On the one hand, we have Kevan Brumfield, a man who murdered Louisiana police officer Betty Smothers and who has spent the last 20 years claiming that his actions were the product of circumstances beyond his control. On the other hand, we have Warrick Dunn, the eldest son of Corporal Smothers, who responded to circumstances beyond his control by caring for his family, building a professional football career, and turning his success on the field into charitable work off the field.

A

Given that the majority devotes a single sentence to a description of the crime for which a Louisiana jury sentenced Brumfield to death, I begin there.

Corporal Smothers, a 14-year veteran of the Baton Rouge Police Department, was working a second job to support her family when she was murdered just after midnight on January 7, 1993. Following a 10-hour shift at the department on January 6, Corporal Smothers reported to a local grocery store, where she served as a uniformed security officer with the official authorization of the department. She monitored the security of the grocery store and waited to escort the assistant manager, Kimen Lee, to a local bank to make the store's nightly deposit.

Corporal Smothers followed her usual practice of driving Lee to the bank in her police cruiser. Shortly after midnight, they arrived at the bank's night depository. As Lee leaned out of the passenger side door to make the deposit, she heard the racking of the slide on a handgun. Brumfield and his accomplice, Henri Broadway, then opened fire on the two women.

Brumfield fired seven rounds from a .380-caliber handgun at close range from the left side of the cruiser, while Broadway fired five rounds from a .25-caliber handgun from the right rear of the cruiser. Brumfield hit Corporal Smothers five times in the forearm, chest, and head. Lee was hit multiple times as well, causing 11 entrance and exit wounds, but she somehow managed to slide over on the bench seat and take control of the police car. She drove to a nearby convenience store, where she was able to call for help and to describe Broadway to police. Emergency responders transported both women to the hospital. Corporal Smothers was pronounced dead on arrival. Lee survived.

On January 11, 1993, Baton Rouge police arrested Brumfield for Corporal Smothers' murder. After several

hours of police interrogation, during which he denied involvement in the murder, Brumfield eventually gave a videotaped confession.[1] He admitted that, after riding around at night looking for a "hustle," he had come up with the idea to steal the grocery store's deposit. He described how he and Broadway hid in the bushes waiting for the car to arrive, and how, when Lee looked back while trying to make the deposit, he started shooting. He admitted that he had fired seven rounds from his .380-caliber handgun, that Broadway had fired five shots with the .25-caliber handgun, and that a third man had served as the getaway driver.

A Louisiana jury convicted Brumfield of first-degree murder. In addition to his videotaped confession, the State introduced evidence that Brumfield had spoken about committing a robbery to several people in the weeks leading up to the murder. He was facing sentencing on unrelated charges and had promised his pregnant girlfriend that he would obtain money to support her, their baby, and her child from a previous relationship while he was in jail. The State also introduced evidence that Brumfield had told an acquaintance right after the murder that he had just killed "a son of a bitch." Record 3566.

## B

At the penalty phase, the State sought a death sentence. It reintroduced the evidence from the guilt phase, along with evidence of Brumfield's other criminal acts.[2] The

————————

[1] The videotaped confession can be found at http://www.supremecourt. gov/media/media.aspx.

[2] Although not introduced at trial, it is worth noting that the night of Corporal Smothers' murder was apparently not her first interaction with Brumfield. Six years earlier, she had caught him stealing and had given him a chance to turn his life around, a chance he unfortunately did not take. See W. Dunn & D. Yaegar, Running for My Life: My Journey in the Game of Football and Beyond 12 (2008). As Corporal Smothers' eldest son recounted, "[Brumfield] told me a story that in

felony convictions for which Brumfield was awaiting sentencing when he murdered Corporal Smothers were for attempted possession of cocaine and felony theft of a gun. Brumfield had worked only three months in his adult life because, as he had admitted to his psychologist, he found drug dealing a far more effective way to make money. In fact, he had been involved a few years earlier in the fatal shooting of a fellow drug dealer in a deal gone bad. And 10 months after he murdered Corporal Smothers, Brumfield battered another police officer while in prison.

The State also explained that Brumfield's murder of Corporal Smothers was the culmination of a 2-week crime spree. On Christmas Day 1992, Brumfield robbed Anthony Miller at gunpoint after giving him a ride. He forced Miller out of the car, put a gun to Miller's head, and pulled the trigger. Fortunately for Miller, the gun misfired, and he survived. One week later, Brumfield robbed Edna Marie Perry and her daughter Trina Perkins at gunpoint as they were walking along the side of the road. Brumfield pulled alongside them, pointed a sawed-off shotgun at Perry, and said, "Hand it over, bitch." *Id.*, at 3790. Perry turned over her purse, but pleaded with Brumfield to give back the pictures from her deceased son's funeral that she carried in the purse. He responded none too courteously, "Bitch, you dead," and drove away. *Ibid.*

The State also introduced evidence about the murder's broader impact. In addition to serving as a police officer, Corporal Smothers was a single mother to six children and a volunteer coach at a local track club. Her children, who ranged from 10 to 18 years old, went to live with their grandmother after the murder. The loss of their mother

—————

1987, my mother, working security at a store, caught him stealing and made him put back whatever he took. . . . Brumfield said my mom could have made an example of him that day, but she elected not to. I thought to myself, that was Mom—always giving people second chances to do right." *Ibid.*

weighed heavily on all of them. It was particularly hard on Corporal Smothers' eldest son, Warrick, who had been especially close to his mother, and on her second eldest son, Derrick Green, who had been hoping to spend more time with her after Warrick went off to college. Derrick was deprived of that chance, and he and Warrick had to take on extra responsibilities to care for their younger siblings.

For his part, Brumfield introduced evidence that his crimes were "beyond his control," a product of his disadvantaged background. *Id.*, at 3927. He was born at a low birth weight, and his mother testified that he spent several months in the hospital shortly after his birth. His father left the family, and his stepfather would make him sit in the corner on hot rice, whip him, and hit him over the head with a telephone book. His brother eventually decided to go live with their biological father. Brumfield opted to stay with his mother and stepfather.

When he was around seven or eight years old, Brumfield began to have behavioral problems. He had trouble staying in his seat at school, was disruptive, easily distracted, and prone to fighting. He was eventually taken to a psychiatric hospital to address his hyperactivity. Although he was a straight-A student until the third grade, his time in four or five group homes educated him in the criminal lifestyle, and his grades began to suffer.

Dr. Cecile Guin, a social worker, testified that Brumfield's hyperactivity and acting out could be traced largely to his low birth weight, lack of a supportive home environment, and abusive stepfather. Although she was not a medical doctor, she concluded that Brumfield had a "neurologically based hyperactive or learning disability problem." *Id.*, at 3886. She acknowledged, however, that his school records described him as having a behavior disorder—"a pattern situation or inappropriate behavior extended over a long period of time which cannot be ex-

plained by intellectual, sensory, neurological or other general factors." *Id.*, at 3882. She also admitted on cross-examination that a psychologist, Brian T. Jordan, had not diagnosed Brumfield as suffering from any neurological disorder, but instead from "a sociopathic personality disorder, antisocial type, poor impulse control, especially in the area of aggression." *Id.*, at 3897–3898.

Dr. John Bolter, a clinical neuropsychologist, testified on behalf of the defense that Brumfield suffered from an antisocial personality disorder. Based on a battery of tests employed to determine whether Brumfield suffered from "any kind of neurological deficits in cognitive functions," Dr. Bolter concluded that Brumfield early on in life "manifest[ed] . . . a conduct disorder with extreme levels of aggressivity and a disregard for the basic rights of others," along with "an attention deficit disorder of some type." *Id.*, at 3904. Over time, he "emerged into what looks more like an antisocial personality," and he continued to have "attention difficulty" and "borderline general level of intelligence." *Ibid.* Brumfield's IQ score was a 75, placing him at about the seventh percentile of the general population or "on the low end of intelligence." *Ibid.* His reading skills were at about a fourth-grade level, while his math and spelling skills were at about a sixth-grade level. On the other hand, Dr. Bolter concluded that Brumfield's "problem solving, judgment and reasoning skills [we]re sufficient to meet the demands of everyday adulthood and he [wa]s not showing any decrement in the types of problems one would assume to see if they were suffering from an underlying organic basis or mental illness." *Id.*, at 275. Dr. Bolter had also reviewed Dr. Jordan's report, and he testified that the only inconsistency in their conclusions was that Dr. Jordan rated Brumfield's intelligence "just a little higher than" he did. *Id.*, at 3907.

The jury unanimously recommended that Brumfield be sentenced to death. It found three statutory aggravators

that made him eligible for that penalty: He was engaged in the attempted perpetration of an armed robbery; he knowingly created a risk of death or great bodily harm to more than one person; and the victim was a peace officer engaged in her lawful duties. The jury found no statutory mitigators.

### C

Brumfield's argument that his actions were the product of his disadvantaged background is striking in light of the conduct of Corporal Smothers' children following her murder. Most widely known is that of Warrick. Though he had turned 18 just two days before Brumfield murdered his mother, he quickly stepped into the role of father figure to his younger siblings.[3] In his view, it "was up to [him] to make sure that everybody grew up to be somebody." W. Dunn & D. Yaegar, Running for my Life: My Journey in the Game of Football and Beyond 37 (2008).

To that end, Warrick led by example, becoming a star running back at Florida State University and then in the National Football League (NFL). During his time at Florida State, he set records on the field while coping with the loss of his mother. *Id.,* at 71, 111, 117. Though separated from his family in Louisiana, he called his brothers and sisters regularly,[4] sought parenting advice from his

—————

[3] Like Brumfield, Warrick's father was not a part of his life. *Id.,* at 51. But, unlike Brumfield, Warrick did not use the absence of a father figure as a justification for murder. *Ibid.* Instead, he recognized that his mother had been "the family patriarch" when she was alive, *ibid.* and that he had a responsibility to take on that role after her death, *id.,* at 37.

[4] In a letter to Brumfield, one of Corporal Smothers' daughters, Summer, later wrote: "Can you imagine life at 14 without your mother, no father to step up and take responsibility for his seed? Not knowing where your next meal will come from, or where you are going to lay your head at night, or even who's going to sacrifice their life to raise six children because of someone's selfish acts? Do you know what this can

coach, and returned home when he could. *Id.,* at 111–113. He kept his mother's pearl earrings, stained with her blood from the night she was murdered, in a box on his dresser. *Id.,* at 71. After four years at Florida State, Dunn was drafted by the Tampa Bay Buccaneers. Concerned that some of his siblings were struggling in Baton Rouge, he moved the three youngest into his home in Tampa Bay. *Id.,* at 139. Although the strain of playing for the Buccaneers and raising his family weighed on him, he "accepted it as [his] responsibility . . . to make sure they stayed on the right path." *Ibid.*

While balancing football and family, Dunn still found time for others. He started Homes for the Holidays, a charitable organization that decorates and fully furnishes—down to the toothbrush—homes obtained by single mothers through first-time homeowner assistance programs. Dunn was inspired by his own mother, who spent years working toward the purchase of a home for her family, but, thanks to Brumfield, did not live to reach her goal. *Id.,* at 152.

Dunn's contributions did not end there. After joining the Atlanta Falcons in 2002, he expanded the reach of Homes for the Holidays, *id.,* at 157; traveled overseas to visit our Armed Forces, *id.,* at 200–201; led an effort to raise money from the NFL to help respond to the tragic effects of Hurricane Katrina, *id.,* at 202–205; and became a founding member of Athletes for Hope, an organization dedicated to helping athletes find and pursue charitable opportunities, *id.,* at 207–208. Following his retirement from professional football in 2008, Dunn launched two more charitable organizations in honor of his mother: Betty's Hope, a mobile bereavement program that offers no-cost grief counseling services to children in the Baton

_____

[do to] a 14-year-old's physical, emotional, and mental state of mind?" *Id.,* at 13 (italics deleted).

Rouge area, and Homes for Service, a program dedicated to helping service members, police officers, and firefighters achieve home ownership. As Dunn once remarked, "I knew that was what my mother would have been most proud of: not my records, not my awards, but the way I used my worldly success to give something back." *Id.,* at 157.

## D

Brumfield, meanwhile, has spent the last 20 years engaged in a ceaseless campaign of review proceedings. He raised numerous challenges on direct appeal to the trial court's discovery orders, admission of evidence, jury instructions, and preservation of the record; the prosecutor's references during the penalty phase; and the alleged deficiencies of his trial counsel. The Louisiana Supreme Court rejected each of these claims, *State* v. *Brumfield*, 96–2667 (La. 10/20/98), 737 So. 2d 660, and this Court denied his petition for a writ of certiorari, *Brumfield* v. *Louisiana*, 526 U. S. 1025 (1999).

In 2000, Brumfield filed his first petition for state post-conviction relief. In that petition, among other things, he alleged 9 instances of prosecutorial misconduct, over 18 instances of ineffective assistance of counsel, and at least 17 constitutional errors in the jury instructions at the guilt phase of his trial.

Brumfield sought and received multiple extensions of time before finally filing his amended petition for state postconviction relief in 2003. He raised many of the same claims as he had in his initial petition, but also asserted for the first time that he was mentally retarded and therefore ineligible for the death penalty under *Atkins* v. *Virginia*, 536 U. S. 304 (2002). In support of that claim, he alleged that his IQ score was 75, that his reading level was that of a fourth grader, that he was born prematurely with a low birth weight and indications of slower responses

than normal babies, that he had suffered seizures and been prescribed a variety of medications since childhood, that he was twice treated in psychiatric hospitals during childhood and adolescence, and that he had been diagnosed with a learning disability.

The state court denied Brumfield's petition. In a ruling from the bench, the court explained that not every defendant who requests an evidentiary hearing on an *Atkins* claim is entitled to one. Based on its review of "the application, the response, the record, portions of the transcript on that issue, and the evidence presented, including Dr. Bolter's testimony, Dr. Guin's testimony, which refers to and discusses Dr. Jordan's report," App. to Pet. for Cert. 171a, it concluded that Brumfield had not met his burden to make a threshold showing of mental retardation. In particular, the court noted that Brumfield had an IQ score of 75 or higher and had demonstrated no impairment in adaptive skills. Although Brumfield had requested fees to develop his *Atkins* claim, the trial court did not explicitly rule on the motion, and Brumfield's counsel did not prompt him to do so.

Brumfield then sought federal collateral review. In his first habeas application, he repeated many of his claims, including the claim that he is ineligible to be executed under *Atkins*. He requested funds to develop that claim in an evidentiary hearing. The District Court dismissed all of his claims except for the *Atkins* one and ordered an evidentiary hearing. As the majority describes, the District Court eventually granted a writ of habeas corpus. It concluded that the state court had based its denial of Brumfield's *Atkins* claim on an unreasonable determination of the facts and had unreasonably applied clearly established Supreme Court precedent in denying him funds to develop the claim. The U. S. Court of Appeals for the Fifth Circuit reversed, concluding that the District Court should not have conducted an evidentiary hearing

and that AEDPA did not afford relief on either of the grounds identified by the District Court. 744 F. 3d 918, 926–927 (2014).

## II

AEDPA limits "the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen* v. *Pinholster*, 563 U. S. 170, \_\_\_ (2011) (slip op., at 8). As relevant here, 28 U. S. C. §2254(d) provides that a federal court may not grant an application

> "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In applying this "highly deferential standard for evaluating state-court rulings, . . . state-court decisions [must] be given the benefit of the doubt." *Pinholster*, 563 U. S., at \_\_\_ (slip op., at 9) (internal quotation marks omitted). They must be reviewed solely on "the record that was before the state court that adjudicated the claim on the merits." *Id.,* at \_\_\_, \_\_\_, and n. 7 (slip op., at 9, 12, and n. 7). And the prisoner must rebut any state court factual findings he seeks to challenge by clear and convincing evidence under §2254(e)(1). *Burt* v. *Titlow*, 571 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 5).

Brumfield presents two grounds for relief under this framework. First, he argues that the Louisiana state court denied his *Atkins* claim based on an unreasonable

determination of the facts, §2254(d)(2).[5]  Second, he argues
that the Louisiana state court violated clearly established
federal law as determined by this Court when it denied
him funding to develop evidence for that claim,
§2254(d)(1).

## III

The majority resolves the case solely on Brumfield's first
ground, so I begin there.

## A

The Louisiana state court's decision to deny Brumfield's
*Atkins* claim was not based on an unreasonable determi-
nation of the facts.  "[A] state-court factual determination
is not unreasonable merely because the federal habeas
court would have reached a different conclusion in the
first instance."  *Wood* v. *Allen*, 558 U. S. 290, 301 (2010).
Where the record supports a state court's factual determi-
nations, the prisoner cannot make that showing.  See, *e.g.,*
*Titlow*, *supra*, at ___–___ (slip op., at 6–7).  Here, the state
court rejected Brumfield's *Atkins* claim in an oral ruling as
follows:

> "Dr. Bolter in particular found [Brumfield] had an IQ
> of over—or 75.  Dr. Jordan actually came up with a
> little bit higher IQ.  I do not think that the defendant

---

[5] Although this question presented in his petition is framed as one of
law—"[w]hether a state court that considers the evidence presented at
a petitioner's penalty phase proceeding as determinative of the peti-
tioner's claim of mental retardation under *Atkins v. Virginia*, 536 U. S.
304 (2002), has based its decision on an unreasonable determination of
the facts under 28 U. S. C. §2254(d)(2)," Pet. for Cert. i—Brumfield
reframed his question at oral argument as purely one based on the
factual determinations made in his case, Tr. of Oral Arg. 27–28.  He
properly conceded that a court does not necessarily make its decision
based on an unreasonable determination of the facts when it rejects an
*Atkins* claim based on a record developed before *Atkins*.  Tr. of Oral
Arg. 7–8.

has demonstrated impairment based on the record in adaptive skills. The doctor testified that he did have an anti-social personality or sociopath, and explained it as someone with no conscience, and the defendant hadn't carried his burden [of] placing the claim of mental retardation at issue." App. to Pet. for Cert. 171a–172a.

That statement contains three factual determinations: (1) Brumfield's IQ was at least 75; (2) Brumfield had not demonstrated impairment in adaptive skills; and (3) Brumfield has an antisocial personality disorder. Each of these facts is amply supported by the state-court record.

To begin, the record justifies a finding that Brumfield's IQ is 75, if not a bit higher. Dr. Bolter testified, without contradiction, that Brumfield scored a 75 on the IQ test he administered and that "Dr. Jordan rated [Brumfield's] intelligence just a little higher than I did." Record 3907. Dr. Bolter's report similarly shows that Brumfield's test results were "lower than estimated by Dr. Jordan in January of this year," but it notes that "Dr. Jordan was using a screening measure which proves to be less reliable." *Id.,* at 272. The parties dispute whether Dr. Jordan's report was made part of the record, but to the extent it was, it confirms Dr. Bolter's testimony. Although it does not specify an IQ score, Dr. Jordan's report states that Brumfield's "intellectual function is slightly limited but generally close to the Average Range" and that a psychological test showed him "to be intellectually functioning generally in the low Average Range." App. 428a–429a. Because two thirds of all IQs are expected to lie between 85 and 115, a fair reading of Dr. Jordan's statements would suggest an IQ score closer to 85. See American Association on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 37 (9th ed. 1992).

The record likewise supports the state court's finding

that Brumfield is not impaired in adaptive skills. Under *Atkins*, the relevant adaptive skill areas are "'communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.'" 536 U. S., at 308, n. 3. Dr. Bolter reported that Brumfield's speech was "intelligible and prosodic" without "evidence of thought derailment," Record 271, and that his writing appeared "normal," *id.*, at 273. Brumfield lived independently before his arrest, often staying with his pregnant girlfriend and had been able to maintain a job for approximately three months before quitting "because his earnings were better through distributing drugs and selling firearms." *Id.*, at 271. Although Brumfield reads at a fourth-grade level and spells and performs arithmetic at a sixth-grade level, Dr. Bolter concluded that he "has a normal capacity to learn and acquire information when given the opportunity for repetition." *Id.*, at 276.

Finally, the record supports a finding that Brumfield has an antisocial personality disorder. Dr. Bolter testified, without contradiction, that what manifested in childhood as a conduct disorder had developed in adulthood into an antisocial personality disorder. He described that disorder as "an absence of a conscience" and "the ability to disregard the rights and feelings of others in favor of what you want" without any "sense of compunction or remorse." *Id.*, at 3909. Dr. Guin acknowledged that Dr. Jordan had reached a similar diagnosis. Brumfield presented no medical evidence disputing it. That the majority disputes "[t]he relevance of this diagnosis," *ante,* at 14, does not make it any less supported by the record.

Brumfield thus not only has failed to rebut the state court's factual findings by clear and convincing evidence, §2254(e)(1), he has failed to show that they were anything other than eminently reasonable. Under any fairminded application of §2254(d)(2), he would not be entitled to

relief.

## B

### 1

The majority reaches the opposite result with a bit of legerdemain, recasting *legal* determinations as *factual* ones. It contends that the state court erred in denying Brumfield's claim because the evidence Brumfield presented "was entirely consistent with intellectual disability" as defined in Louisiana and thus sufficient to entitle him to an evidentiary hearing. *Ante,* at 8–9. That argument betrays the legal nature of the majority's dispute with the state court's decision: The majority does not—because it cannot—disagree that each of the state court's factual findings was supported by the record. See *ante*, at 9–10 (not disputing Brumfield's IQ score); *ante,* at 14 (not disputing Brumfield's diagnosed antisocial personality disorder); *ibid.* (acknowledging that "evidence in the record before the state court may have cut against Brumfield's claim of intellectual disability"); *ante,* at 15 (acknowledging that "the underlying facts of Brumfield's crime might arguably provide reason to think that Brumfield possessed certain adaptive skills"). Instead, the majority disagrees with the state court's *conclusion* that Brumfield had not made a sufficient threshold showing of mental retardation to be entitled to an evidentiary hearing on his claim. *Ante,* at 15–16.

*That* conclusion, however, is properly characterized as one based on the application of law to fact, not on the determination of the facts themselves.[6] As we have ex-

_____

[6] The majority attempts to defend its recharacterization of the inquiry on the ground that the State invoked §2254(d)(2). The State invoked that provision because that is the basis upon which Brumfield sought federal collateral relief. But, Brumfield is not entitled to that relief unless he can show that the state court based its decision to deny his *Atkins* claim on unreasonable factual determinations. Rather than

plained, "The question whether a state court errs in determining the facts is a different question from whether it errs in applying the law." *Rice* v. *Collins*, 546 U. S. 333, 342 (2006). No one can dispute that Brumfield's IQ score, adaptive skills, and antisocial personality disorder are facts. By contrast, the question whether Brumfield has met the legal standard for relief on, or at least an evidentiary hearing with regard to, his *Atkins* claim requires the application of law to those facts. See *Panetti* v. *Quarterman*, 551 U. S. 930, 948–952 (2007) (applying §2254(d)(1) to conclude that a state court unreasonably applied clearly established federal law when it failed to provide a prisoner with a competency hearing after he made "'a substantial threshold showing of insanity'").[7] Indeed, in discussing each of these "factual determinations," the majority turns first to state law to determine what showing a prisoner must make to qualify as mentally retarded. *Ante,* at 9, 11 (citing *State* v. *Williams*, 2001–165 (La. 11/1/02), 831 So. 2d 835). If the majority's disagreement with the state court's decision were truly based on "factual determinations," it is hard to understand what relevance state law would have.

----

address those determinations, the majority addresses something else entirely.

[7] To be sure, the question whether someone is mentally retarded is one of fact. But that is not the question at issue in an *Atkins* claim. *Atkins* held that a category of mentally retarded offenders could not be executed consistent with the Eighth Amendment because a national consensus had developed against such executions. It acknowledged that there was disagreement about how to define mentally retarded offenders and clarified that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." 536 U. S., at 317. Thus, when a prisoner brings an *Atkins* claim, he bears the burden to establish not just the "fact" of his mental retardation, but also that he is sufficiently impaired to fall within the category of persons identified in *Atkins* as legally beyond a State's power to execute.

2

Even on its own terms, the majority's so-called "factual" analysis fails. The majority holds that the record supported a finding that Brumfield qualified for a hearing on mental retardation under *state* law. To reiterate, even if true, this state-law-based *legal* analysis cannot overcome AEDPA's bar to relief under §2254(d)(2). To make matters worse, the majority gets the state law wrong.

The Louisiana Supreme Court's decision in *Williams* instructed state courts to use the statutory standard for determining when a pretrial competency hearing is necessary—when there is "'reasonable ground to doubt the defendant's mental capacity to proceed.'" 831 So. 2d*,* at 858, n. 33 (quoting La. Code Crim. Proc. Ann., Art. 643 (West 2003)).[8] It made clear that "reasonable ground to doubt" is "*not* a reference to proof beyond a reasonable doubt in the guilt phase of the trial," 831 So. 2d, at 858, n. 33 (emphasis added),[9] and that the burden was on the prisoner to bring forward objective evidence to put his mental retardation at issue.

Brumfield's IQ test score failed to meet the standard for significantly subaverage intellectual functioning under Louisiana law. As *Williams* explained, Louisiana statutes defined "'significantly subaverage general intellectual functioning'" as "'more than two standard deviations

---

[8] It is unclear whether *Williams* even continued to supply the governing state law at the time the state court acted, for the Louisiana Legislature had established a procedure for adjudicating claims of mental retardation in capital cases three months before Brumfield's hearing. See 2003 La. Acts p. 698 (enacting La. Code Crim. Proc. Ann., Art. 905.5.1 (West Supp. 2015)). Because that law did not specifically address the circumstances under which capital defendants would be entitled to a hearing on such claims, however, I assume for the sake of argument that *Williams* supplies the applicable state law.

[9] The majority's persistent characterization of this standard as a "reasonable doubt" standard is quite misleading. *Ante,* at 7, 15, 18.

below the mean for the test of intellectual functioning,'" and a person with intellectual functioning two standard deviations below the mean "would have an IQ of 70 using the Wechsler scale." *Id.,* at 853, and n. 26. Accounting for the standard error of measurement, *Williams* explained that the requisite IQ could range "from 66 to 74." *Id.,* at 854, n. 26.[10] The majority prefers to avoid this language, focusing instead on "[t]he sources on which *Williams* relied in defining subaverage intelligence." *Ante,* at 9. But the way to apply a state court's decision is to apply what the state court said, and, at 75 and higher, Brumfield's IQ scores exceeded the cutoff for significantly subaverage general intellectual functioning under that decision.

Brumfield's evidence of alleged deficits in adaptive skills similarly failed to meet the requisite standards under Louisiana law. *Williams* defined deficits in adaptive skills as "'substantial functional limitations in three or more of the following areas of major life activity:'" (1) self-care, (2) understanding and use of language, (3) learning, (4) mobility, (5) self-direction, and (6) capacity for independent living. 831 So. 2d, at 853 (quoting then La. Rev. Stat. Ann. 28:381(12) (repealed 2005)). The only evidence Brumfield presented that is even potentially relevant to these factors was evidence of his poor reading skills and behavioral problems in school. But, once again, Dr. Bolter's report confirmed that he had "a normal capacity to learn and acquire information when given the opportunity for repetition" and that Brumfield's behavioral problems

---

[10] As the majority points out, the Court in *Williams* was "using this example to illustrate the concept of [the standard error of measurement]," *ante* at 10, n. 4, but it was illustrating the standard error of measurement *as it related* to the Louisiana law defining significantly subaverage general intellectual functioning as "'more than two standard deviations below the mean for the test of intellectual functioning,'" *Williams, supra,* at 853, and n. 26 (quoting then La. Rev. Stat. Ann. 28:381(42) (repealed 2005)).

were attributable to "a conduct disorder that . . . progressed into an antisocial personality disorder." Record 276. The majority places special weight on Brumfield's placement in "special education" classes, *ante,* at 4, 13, n. 7, 14, 15, but the record explains that he was placed in *behavioral disorder* classes not because he had a low capacity to learn, but because he had a high capacity to make trouble, Record 3846–3847.[11] The state court could reasonably have found that Brumfield had not provided evidence of "substantial functional limitations" in any of these categories, let alone the *three* required by state law.

Absent objective evidence of either significantly subaverage intellectual functioning or deficits in adaptive behavior, Brumfield was not entitled to an evidentiary hearing under *Williams.* The majority's analysis is erroneous: It takes a meritless state-law claim, recasts it as two factual determinations, and then awards relief, despite ample evidence in the record to support each of the state court's *actual* factual determinations.

C

The majority engages in such maneuvering because Brumfield argued *only* that the state court based its decision to deny his *Atkins* claim on an unreasonable determination of the facts, §2254(d)(2), not an unreasonable application of clearly established federal law as determined by this Court, §2254(d)(1). Brumfield, for his part, presented his claim in this way to avoid AEDPA's additional restrictions on relief for alleged legal errors. As explained below, overcoming §2254(d)(1)'s bar based on an alleged

---

[11] The majority places great reliance on the testimony of Dr. Guin, who was *not* a medical doctor, that Brumfield's "out of control behavior" in the classroom, Record 3879, was a function in part of a learning disability, *ante,* at 13. But, Dr. Guin was not qualified to make that diagnosis, and she acknowledged that the school had diagnosed him only with a behavioral disorder. Record 3882.

legal error is particularly demanding. Brumfield's arguments, even if presented properly as legal ones, would not meet the bar.

Under §2254(d)(1), a federal court may not award relief for a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." "Clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." *White* v. *Woodall*, 572 U. S. ___, ___ (2014) (slip op., at 3) (internal quotation marks and alteration omitted). A state court's decision is therefore not "contrary to" our decisions unless its holding contradicts our holdings, or it "'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" *Mitchell* v. *Esparza*, 540 U. S. 12, 15–16 (2003) (*per curiam*). A state court's decision is not "'an unreasonable application'" of our decisions if it merely "'decline[s] to apply a specific legal rule that has not been squarely established by this Court.'" *Harrington* v. *Richter*, 562 U. S. 86, 101 (2011). Instead, the Court must evaluate the application of our holdings in the context of the rule's specificity: "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* (internal quotation mark omitted). "[W]here the precise contours of [a] right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Woodall*, *supra*, at ___ (slip op., at 9) (internal quotation marks omitted).

"If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U. S., at 102. "'Federal habeas review of state convictions . . . disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offend-

ers, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.'" *Id.,* at 103. Although AEDPA "stops short of imposing a complete bar" on this type of review, it does require "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.,* at 102–103. Brumfield cannot meet this standard.

1

The state court's decision to deny Brumfield's *Atkins* claim was not contrary to any holding of this Court. The state court recognized that *Atkins* precludes the execution of mentally retarded offenders and then concluded that Brumfield did not qualify as a mentally retarded offender. Because this Court has never confronted a set of facts that are materially indistinguishable from the facts in this case and arrived at a different result, the state court's decision was not "contrary to" clearly established federal law as determined by this Court.

Nor is the decision of the state court to deny a *hearing* on the claim contrary to such clearly established law. In *Atkins*, this Court held that the Eighth Amendment precludes the execution of mentally retarded offenders, but "le[ft] to the States the task of developing appropriate ways to enforce the constitutional restrictions upon their execution of sentences." 536 U. S., at 317 (internal quotation mark and brackets omitted). This Court did not so much as mention an evidentiary hearing, let alone hold that prisoners raising *Atkins* claims are entitled to one. To be sure, *Atkins* cited this Court's decision in *Ford* v. *Wainwright*, 477 U. S. 399 (1986), when it explained that it was leaving the enforcement of the right to the States. See 536 U. S., at 316–317. Justice Powell's controlling

concurrence in *Ford* required a court to afford a prisoner a hearing on the claim that he is insane and therefore ineligible to be executed after a prisoner made a "substantial threshold showing of insanity." 477 U. S*.,* at 426 (opinion concurring in part and concurring in judgment). The citation in *Atkins*, however, not only was not to that portion of *Ford*, it was not even to Justice Powell's *opinion* in *Ford*. Compare *Atkins*, *supra,* at 317 (citing *Ford*, *supra,* at 405 (majority opinion), 416–417 (opinion of Marshall, J.)), with *Ford*, *supra,* at 426 (opinion of Powell, J.). *Atkins* thus did not imply—let alone hold—that a prisoner is entitled to a hearing on an *Atkins* claim. There being no mention of a hearing, the state court's decision to deny Brumfield such a hearing could not be "contrary to . . . clearly established Federal law." §2254(d)(1).

Even if *Atkins did* establish a right to an evidentiary hearing upon a threshold showing of mental retardation, the state court's decision to deny Brumfield a hearing would not be contrary to that rule. After all, the state court took the position that Brumfield would have been entitled to an evidentiary hearing if he had made a threshold showing of mental retardation; it simply concluded that he had not made that showing. This Court has never confronted a set of materially indistinguishable facts and found the threshold showing satisfied. Thus, as with its rejection of the *Atkins* claim itself, the state court's decision to deny Brumfield an *Atkins* hearing was not contrary to clearly established federal law as determined by this Court.

2

The state court's decision here likewise was not an unreasonable application of *Atkins*. The *Atkins* Court did not clearly define the category "of mentally retarded offenders about whom there is a national consensus." 536 U. S., at 317. It offered guidance in the form of several

clinical definitions of mental retardation as "'subaverage intellectual functioning'" accompanied by "significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.,* at 318. It gave conflicting indications of the IQ score necessary for "subaverage intellectual functioning," defining mild mental retardation as the term used to describe "people with an IQ level of 50–55 to approximately 70," *id.,* at 308, n. 3; and citing one source that reports 70 or less as the statistical criterion for mental retardation, *id.,* at 309, n. 5; see 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2589 (B. Sadock & V. Sadock eds., 7th ed. 2000); but commenting that "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition," 536 U. S*.,* at 309, n. 5. It offered no greater specificity with respect to "significant limitations in adaptive skills," though it remarked that, "by definition," mentally retarded offenders "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.,* at 318.

The state court here reasonably applied the general rule announced in *Atkins* when it rejected Brumfield's claim. Brumfield achieved a 75 on the IQ test administered to him by Dr. Bolter, 5 points above the score identified by *Atkins* as the upper end of "'[m]ild'" mental retardation, *id.,* at 308, n. 3, and by clinical definitions as the criterion for mental retardation. He also scored somewhat higher on the IQ tests administered to him by Dr. Jordan. In addition, he demonstrated no impairment in adaptive skills. To the contrary, his test results "indicate[d] that his problem solving, judgment and reasoning skills are sufficient to meet the demands of everyday adulthood and

he is not showing any decrement in the types of problems one would assume to see if they were suffering from an underlying organic basis or mental illness." Record 275. Based on this record, the state court reasonably concluded that Brumfield had not come forward with evidence that he fell within the category of mentally retarded offenders about whom a national consensus against execution had developed.

For the same reasons, even if one were to mischaracterize *Atkins* as clearly establishing a right to an evidentiary hearing upon a substantial threshold showing of mental retardation, the state court did not unreasonably apply that rule. *Atkins* did not define the showing necessary, and the state court reasonably concluded that, on this record, Brumfield had not met it.[12]

### D

In sum, §2254(d) bars Brumfield's *Atkins* claim. The facts upon which the state court rejected his claim are amply supported by the record and thus not unreasonable. In concluding otherwise, the majority conflates questions of fact with questions about the application of law to fact. That conflation may help it get around the inconveniences of "clearly established Federal law as determined by th[is Court]," §2254(d)(1), but it does violence to the statute and to our ordinary understanding of "facts." Indeed, we have summarily reversed lower courts for making that same error. See, *e.g., Lopez* v. *Smith*, 574 U. S. ___, ___ (2014)

---

[12] It is worth reiterating that the majority's analysis of state law would afford no basis for relief under §2254(d)(1), even if Brumfield had requested relief under that provision. Section 2254(d)(1) serves as a basis for relief only when a state court reached a decision that involved an "unreasonable application of . . . clearly established *Federal* law, as determined by [this] Court." (Emphasis added.) And even if Brumfield could show a violation of state law, which he cannot for the reasons I discussed above, such a violation would "provide no basis for federal habeas relief." *Estelle* v. *McGuire*, 502 U. S. 62, 68, n. 2. (1991).

(*per curiam*) (slip op., at 8) ("Although the Ninth Circuit claimed its disagreement with the state court was factual in nature, in reality its grant of relief was based on a legal conclusion about the adequacy of the notice provided"). We should hold ourselves to the same standard.

## IV

The majority's willingness to afford relief on Brumfield's first ground of alleged error in the state court's dismissal of his *Atkins* claim obviates its need to resolve his second, which focuses on the state court's denial of funding to develop that claim. Because I would conclude that AEDPA bars relief on the first ground, I must also address the second. AEDPA's standards make short work of that ground as well.

The state court's denial of funding to Brumfield was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by this Court. *No* precedent of this Court addresses whether and under what circumstances a state prisoner must be afforded funds to develop an *Atkins* claim. *Atkins* left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." 536 U. S., at 317 (internal quotation marks and brackets omitted). None of our decisions since *Atkins* have even purported to address constitutional requirements for funding of these claims.

Brumfield believes that the decision was contrary to, and involved an unreasonable application of *Ake* v. *Oklahoma*, 470 U. S. 68 (1985), and *Ford* v. *Wainwright*, 477 U. S. 399, but neither of those decisions even involved protections for mentally retarded offenders. Instead, both decisions addressed protections for prisoners asserting *insanity*—*Ake* in the context of insanity as a defense to a crime, 470 U. S., at 70, 77, and *Ford* in the context of insanity as a limitation on the State's power to execute a

prisoner, 477 U. S., at 418 (Powell, J., concurring in part
and concurring in judgment). Neither involved the ques-
tion whether a prisoner is entitled to funds to develop an
insanity claim before he has made a substantial threshold
showing of that claim. Only *Ake* addressed the question of
funds at all, and it held that an indigent defendant has a
right of "access" to a competent psychiatrist to assist in
the preparation of his insanity defense, *not* that an "indi-
gent defendant has a constitutional right to choose a
psychiatrist of his personal liking or to receive funds to
hire his own." 470 U. S., at 83.

The state court fully complied with this Court's deci-
sions when it declined to award Brumfield funds. Brum-
field did not meet his burden to make a substantial
threshold showing of mental retardation. No decision of
this Court requires a State to afford a defendant funds to
do so.

*        *        *

Over 20 years ago, Brumfield deprived the people of
Baton Rouge of one of their police officers and six children
of their mother. A jury of his peers found Brumfield guilty
of the crime and sentenced him to death. The Louisiana
courts afforded him full appellate and collateral-review
proceedings.

Today, the majority tosses those proceedings aside,
concluding that the state court based its decision to deny
Brumfield's *Atkins* claim on an "unreasonable determina-
tion of the facts," even as it concedes that the record in-
cludes evidence supporting that court's factual findings.
Under AEDPA, that concession should bar relief for Brum-
field. In concluding otherwise, the majority distorts fed-
eral law and intrudes upon Louisiana's sovereign right to
enforce its criminal laws and its courts' judgments. Such
willfulness is disheartening.

What is perhaps more disheartening than the majority's

disregard for both AEDPA and our precedents is its disregard for the human cost of its decision. It spares not a thought for the 20 years of judicial proceedings that its decision so casually extends. It spares no more than a sentence to describe the crime for which a Louisiana jury sentenced Brumfield to death. It barely spares the two words necessary to identify Brumfield's victim, Betty Smothers, by name. She and her family—not to mention our legal system—deserve better.

I respectfully dissent.

## APPENDIX



W. Dunn & D. Yaeger, Running for My Life: My Journey in the Game of Football and Beyond (2008).

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–1433

———————

## KEVAN BRUMFIELD, PETITIONER *v.* BURL CAIN, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2015]

JUSTICE ALITO, with whom THE CHIEF JUSTICE joins, dissenting.

I join all but Part I–C of JUSTICE THOMAS' dissent. The story recounted in that Part is inspiring and will serve a very beneficial purpose if widely read, but I do not want to suggest that it is essential to the legal analysis in this case.