# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-70001

United States Court of Appeals
Fifth Circuit

**FILED**

June 30, 2015

Lyle W. Cayce
Clerk

JAMES LEE HENDERSON,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before JOLLY, SMITH and ELROD, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

James Lee Henderson appeals the district court's denial of federal habeas relief on his claim that he is ineligible to be executed because he is intellectually disabled. We AFFIRM.

I.

Although this is not Henderson's first appeal to this Court, we set out the facts and lengthy procedural history before turning to address the arguments of the parties.

At the guilt-innocence phase of Henderson's trial, the State presented evidence that in October 1993, Henderson, who was then 20 years old, along

No. 14-70001

with Ricky Bell, Willie Pondexter, and Deon Williams, broke into the home of Mrs. Martha Lennox in Palestine, Texas. They planned to rob her, steal her car, and go to Dallas. Pondexter had a gun. Henderson told Pondexter to give the gun to him. Henderson entered the house first, holding the gun, and led Bell, Pondexter, and Williams up the stairs. Henderson fired a shot through Mrs. Lennox's bedroom door.

After Williams took $7 and some change from Mrs. Lennox's wallet, Henderson shot Mrs. Lennox in the head. Henderson then handed the gun to Pondexter, who shot Mrs. Lennox in the head again. The medical examiner testified that both wounds were fatal and that either wound could have caused Mrs. Lennox's death. When Henderson and Williams were housed together in the county jail, Henderson told Williams that he shot Mrs. Lennox "because she was looking at him like he had shit on him."

After the robbery and murder, Henderson and his co-defendants drove to Dallas in Mrs. Lennox's Cadillac. The Dallas police stopped the vehicle and arrested Pondexter and Bell. Henderson and Williams fled on foot. The police apprehended Williams. A short time later, Henderson saw Mrs. Lennox's Cadillac being towed away and called "911" to report that his mother's Cadillac had been stolen. When the police responded to the call, they arrested Henderson, who had the murder weapon in his pocket.

Based on this evidence, the jury found Henderson guilty of capital murder.

At the punishment phase, the State presented evidence of Henderson's prior convictions for aggravated robbery, burglary, and unauthorized use of a motor vehicle. The State also presented evidence that Henderson and Williams robbed some young Mexican men when they arrived in Dallas following the murder, and that Henderson got a teardrop tattoo on his face after he was arrested for Mrs. Lennox's murder.

2

No. 14-70001

Several witnesses testified for Henderson at the punishment phase. Barbara Ann Griffin, who had known Henderson since he was a child, testified that he considered her to be an aunt or mother figure. About a year before his arrest for Mrs. Lennox's murder, Henderson lived with Griffin for about a year and helped her around the house. He also worked and gave her money to pay for groceries and bills. She said that Henderson's father was killed when he was a baby and that he also lost his stepfather when he was a small child, so he did not have a father figure. On cross-examination, she answered affirmatively when the prosecutor asked her whether Henderson had the ability to go to school, do his homework, and graduate from high school.

Henderson's mother, Eunice Henderson, testified about his impoverished childhood and the deaths of his father and stepfather. They lived in a two-room house and at times did not have running water when Henderson was growing up. She said that Henderson was "like any other kid" and that he liked to work, but sometimes got in trouble at school.

Clara Murphy, Henderson's third cousin, testified that she had known him all her life. She described his impoverished background, and his mother's lack of supervision and discipline at home.

Marquetta Hearn testified that she and Henderson had planned to be married the previous year and that they had a baby who was then about six months old. She testified that he worked at a lumber company and helped her buy food.

Based on the jury's answers to the special punishment issues, the trial court sentenced Henderson to death in 1994. The Texas Court of Criminal Appeals (TCCA) affirmed his conviction and sentence on direct appeal. *Henderson v. State,* No. AP–71,928 (Tex. Crim. App. Dec. 18, 1996) (en banc) (unpublished). The Supreme Court denied certiorari on November 16, 1998. *Henderson v. Texas,* 525 U.S. 1004 (1998).

No. 14-70001

On July 8, 1998, the TCCA denied Henderson's first state habeas application. *Ex parte Henderson*, No. 37,658–01 (Tex. Crim. App. July 8, 1998) (unpublished). The TCCA dismissed Henderson's first subsequent state habeas application as an abuse of the writ in October 1999.

Henderson filed a federal habeas petition on January 27, 1999. The district court denied relief on September 27, 2001. This Court affirmed the district court's judgment on June 9, 2003. *Henderson v. Cockrell*, 333 F.3d 592 (5th Cir. 2003). The Supreme Court denied certiorari on January 26, 2004. *Henderson v. Dretke*, 540 U.S. 1163 (2004).

On March 24, 2004, Henderson filed a subsequent state habeas application, claiming that he is ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). On April 21, 2004, the TCCA issued an order stating that it had reviewed the application and had found that Henderson had presented facts which, if true, might entitle him to relief. The TCCA remanded the case to the trial court for an evidentiary hearing. *Ex parte Henderson*, No. 37,658–03 (Tex. Crim. App. Apr. 21, 2004) (unpublished). On remand, the trial court conducted an evidentiary hearing on Henderson's *Atkins* claim, on September 2, 2004.

At the *Atkins* evidentiary hearing, four witnesses testified for each side, including one mental health expert for Henderson and two for the State. Dr. Susana Rosin, a licensed psychologist hired by habeas counsel, testified for Henderson. She administered the full Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) to Henderson on January 16, 2004, while he was on death row. Henderson obtained a verbal score of 66, a performance score of 73, and a full-scale score of 66. It was Dr. Rosin's opinion that Henderson was mildly intellectually disabled and that his 2004 IQ score of 66 is valid and reliable. She acknowledged that a 1994 IQ test, done at the request of Henderson's attorney before his capital murder trial, showed that he had a verbal IQ of 71,

4

a performance score of 89, and a full-scale score of 77.[1]  Dr. Rosin testified that she did not believe that the lower IQ score in 2004 reflected malingering by Henderson.

Dr. Rosin also administered the Trail Making Test, which indicated that Henderson is in the mildly impaired range, and the Wide Range Achievement Test-3, which indicated that Henderson has seventh grade equivalents in reading (word recognition) and spelling and a fifth grade equivalent in arithmetic.  Dr. Rosin reviewed previously administered psycho-educational screenings, including a 1988 screening of Henderson that yielded a second-grade reading level on the Wide Range Achievement Test and a 1992 screening that yielded a total reading grade equivalent of 4.9.  She also reviewed trial records, as well as Henderson's juvenile and adult criminal history.  She testified that his IQ score of 66 is consistent with the results from other diagnostic tests administered and reviewed by her.

Dr. Rosin also administered to Henderson the Vineland Adaptive Behavior Scales to assess his adaptive behavior.  She concluded that Henderson has a low adaptive level of functioning, with deficits in self-direction and in work, safety, and academic skills, with age equivalent scores ranging between seven years-six months and eleven years.

Dr. Rosin expressed the following conclusion about the onset of Henderson's intellectual disability:

> [T]here is no evidence of serious accidents, illnesses or head traumas past the age of eighteen which would account for a more recent drop in Mr. Henderson's IQ scores.  Since IQ scores tend to remain fairly consistent throughout life, Mr. Henderson has, in all medical and statistical probability, functioned within the mild

---

[1] The 1994 test was administered by Dr. Hickman, a psychologist whose license had been revoked, and it was "an out-of-date WAIS full/scale test rather than the appropriate WAIS-III test." *Ex parte Henderson*, 2006 WL 167836, at *2 n.3 (Cochran, J., concurring). The TCCA did not adopt the trial court's finding of fact regarding Dr. Hickman's IQ test.

No. 14-70001

[intellectually disabled] range since birth or at least the time IQ
scores can begin to be reliably measured (between the ages of four
and six).

Dr. Rosin acknowledged that she had not seen any IQ test for Henderson before the age of eighteen and that nothing in the available records showed that he had an IQ under 70 before the age of eighteen.

Henderson called three other witnesses who had known him as a child. Milton Glass, a minister with Hopewell United Methodist Church, testified that he first met Henderson when Henderson was in kindergarten and that he taught Henderson in the fifth grade. In the fifth grade, Henderson was in both regular classes and a special education class. Glass testified that Henderson was not "tidy," and did not have good hygiene. He was well below his grade level for writing and a couple of years below his peers in verbal skills. He did not turn in his homework, and sometimes "just didn't come" to school. Reverend Glass testified that Henderson had low self-esteem and was gullible. Henderson vandalized Glass's school room one time by spraying the room with a fire extinguisher. Henderson's school records were unavailable because his school burned down in the early 1990s and all of the school records were destroyed. Although he had not seen Henderson since Henderson was in the seventh or eighth grade, Reverend Glass testified that he believes that Henderson is mildly intellectually disabled.

Altis Rutherford testified that she was in a Head Start kindergarten class with Henderson and had last seen him when they were in the eighth grade. She testified that Henderson came to school smelling of urine and wearing clothes that were too large. She described him as gullible and quiet, and said that he had low self-esteem. Rutherford did not think that Henderson had the ability to perform academically, and she stated that Henderson was held back a year at some point. She thought Henderson was "slow," but she did not think he was intellectually disabled.

6

No. 14-70001

Allegra Deloney testified that she had known Henderson all of her life. She stated that he was gullible, had poor hygiene and often came to school smelling like urine. She knew that his mother had four or five other children, and thought his mother did the best she could with them.

The State offered several exhibits, which were attached to the *Atkins* hearing transcript. Henderson's prison records included his commissary request sheets, inmate request reports, and numerous handwritten football "betting sheets" that had been found in his cell. Henderson kept detailed records of college and professional football games, including the scores, his bets, and whether he had won or lost. His handwritten request reports were clear, concise, and grammatically correct, with good spelling and a reasonably sophisticated vocabulary. His commissary requests were neat and spelled correctly; when he ordered several of the same items, he could multiply the cost per unit by the number requested and obtain the correct total cost. He also had a large collection of reading material, including Tom Clancy and Stephen King novels, in his cell.[2]

Henderson's juvenile intake and probation officer, Creea Impson, testified that during the time she supervised him, before he committed the capital murder, "he was not a follower. He was always aware of what he was doing and why he did it." He was able to formulate plans and carry them through. He wrote rational letters of restitution to his crime victims. Impson testified that Henderson's problem was that he could not modify his behavior and did not follow rules. He was manipulative at times and could control his behavior. He was able to take care of himself and was street-wise in his

---

[2] The inventory of Henderson's reading material includes nearly all of Tom Clancy's novels, as well as novels by John Grisham, Nelson DeMille, David Baldacci, Tess Territsen, John Sandford, Elmore Leonard, Stephen King, and John Sharpe, as well as The Believer's Study Bible and a large collection of sexually explicit magazines.

7

community.  In her opinion, Henderson is not intellectually disabled and she never treated him as such.

Texas Ranger Roger Lough, who picked up Henderson in Dallas after he was arrested for the murder of Mrs. Lennox, testified that he interviewed Henderson (who identified himself as Johnny Mack) and that Henderson responded coherently and rationally, and stayed on point.  Ranger Lough stated that he never had any reason to think Henderson was intellectually disabled.

Steve Gilliland, a psychologist for the Texas prison system who worked as a counselor on death row in 1994, testified that he did an intake assessment of Henderson when Henderson arrived at death row in June 1994, to determine whether Henderson qualified for "special needs placement."  He did not see any obvious indication of the need for further screening, but every inmate had to be ruled out for intellectual disability, so he administered the standard assessment as instructed by his supervisor, Dr. Gillhausen—two out of eleven available subtests of the Wechsler Adult Intelligence Scale—Revised (WAIS-R) (the vocabulary and the block design performance subtests).  Contrary to TDCJ protocol, Gilliland did not record the individual subtest scores, and none of the underlying documentation of the testing exists.  Henderson's estimated full scale IQ score was 83.  Based on that assessment, Gilliland decided that further testing was unnecessary.  On cross-examination, he testified that he is aware that screening instruments should not be relied upon or used for legal, judicial, or quasi-legal proceedings, but used the test as a screening tool to determine whether there was a need for a referral to the special diagnostic team for a definitive diagnosis.

The final witness for the State was Dr. Michael Gillhausen, a licensed psychologist.  He was Gilliland's supervisor at the prison system.  He testified that Gilliland was a professional and that it was not his job to watch every

move that Gilliland made.  He explained that they used two subtests of the WAIS-R to routinely screen inmates for the possibility of intellectual disability. If the screening indicated a need for further testing, a full test would be administered.  Dr. Gillhausen testified that the reliability of the short-form WAIS-R was 94%, which was "very acceptable."  He testified that the reliability of Henderson's IQ score of 83 on the WAIS-R "would allow us to state that his IQ would fall within the range from 76 to 90, about 95% of the time."  He noted that Dr. Rosin had given Henderson some achievement tests for which Henderson scored at the seventh grade level, and pointed out that the mildly retarded usually cannot score above the sixth grade level.

The discrepancies in the test results led Dr. Gillhausen to think that Henderson might have been motivated by "secondary gain" to do poorly on his 2004 post-*Atkins* testing by Dr. Rosin.  He stated that when IQ test results vary widely, the one that is most representative of the individual's intelligence is the highest one, because these are not true-false tests on which an individual can "luck out" or fake knowing the answer.  But if the individual does know the answer, he or she could fake *not* knowing it.

Dr. Gillhausen testified that there are many reasons for putting someone in special education classes as a child, including because one's achievement level is low in relation to his IQ, because he is intellectually disabled or emotionally disturbed, or because of health concerns or disruptive behavior. Dr. Gillhausen noted that Henderson had a long history of disruptive behavior. He observed that Henderson was 31 years old and had no indicated history of mental retardation, but knew when Dr. Rosin tested him that he was being assessed for the purpose of trying to save his life.  Dr. Gillhausen pointed out that the presence of severe behavior problems in youth is not diagnostic of intellectual disability, that a child's grooming is more of an indicator of the parent's adaptive behavior than the child's, that even a genius can have low

9

self-esteem, and that plenty of smart people are gullible.   Dr. Gillhausen was of the opinion that Henderson is not intellectually disabled.

At the conclusion of the hearing, Henderson requested, and the trial court granted, leave to submit briefing on the evidence presented at the hearing.   Henderson also intended to submit proposed findings of fact and conclusions of law and sought, unsuccessfully, to obtain a transcript of the hearing.  In spite of Henderson's numerous telephone calls to the court reporter and the court clerk, Henderson did not receive the transcript of the hearing until over a year later, after the trial court had entered its findings and conclusions on October 11, 2005.  The trial court held that Henderson failed to establish that he is intellectually disabled and recommended that habeas relief be denied.

Henderson objected to the findings and conclusions and to the trial court's failure to comply with the state law requirement that the parties be provided a transcript of evidentiary hearings and an opportunity to submit proposed findings and conclusions, asserting that these omissions made it impossible for him to address Dr. Gillhausen's testimony about the short form IQ test.  Henderson contends that if he had obtained a transcript and been allowed to submit briefing, he could have explained that Dr. Gillhausen confused the concepts of "reliability" and "validity" when he testified that, utilizing a reliability factor of 0.94 from Jerome M. Sattler, ASSESSMENT OF CHILDREN (3d ed. 1988), the reliability of Henderson's IQ score of 83 on the WAIS-R "would allow us to state that his IQ would fall within the range from 76 to 90, about 95% of the time."  Henderson explains that the "reliability" of a test deals with whether the same result is obtained each time the same test is administered to the same person, while the "validity" of a test refers to the extent to which it measures what it is supposed to measure.  According to Henderson, ASSESSMENT OF CHILDREN states that the validity coefficient for

the two-subtest short form WAIS-R administered by Gilliland is 0.90, not 0.94. Applying this validity coefficient to the short form score of 83 obtained in 1994, Henderson claims that there is a 95% probability that he would have earned a full scale IQ in a range from 66 to 92 had he taken the complete WAIS-R, which is consistent with Dr. Rosin's full scale WAIS-III assessment of 66.

On January 25, 2006, the TCCA denied relief. *Ex parte Henderson*, No. WR-37,658–03, 2006 WL 167836 (Tex. Crim. App. Jan. 25, 2006) (unpublished). The TCCA adopted the trial court's findings of fact, with the exception of finding No. 21, which read: "Both Dr. Rosin and Dr. Gillhausen testified that Dr. Hickman evaluated Henderson on June 3, 1994, and his total I.Q. by Dr. Hickman's assessment was 77. . . ." A concurring opinion joined by four judges explained that the 1994 IQ test "was administered by a psychologist whose license had been revoked," and the test was "an out-of-date WAIS full/scale test rather than the appropriate WAIS-III test." *Ex parte Henderson*, 2006 WL 167836, at \*2 n.3 (Cochran, J., concurring). The concurring opinion states that Henderson's case "presents a close question on the ultimate factual issue of [intellectual disability]." *Id.* at \*1 (Cochran, J., concurring). In support of their decision to deny the writ, the concurring judges cited and relied on (1) the short form IQ test administered to Henderson by Gilliland when he arrived at death row that reflected an IQ score of 83; and (2) Dr. Gillhausen's testimony about the "reliability" of that test, that "[t]he reliability of applicant's 83 I.Q. score 'would allow us to state that his I.Q. would fall within the range from seventy-six to ninety, about ninety-five percent of the time . . . .'" *Id.* at \*3 (Cochran, J., concurring) (internal quotation marks omitted). They also described Henderson's evidence of adaptive behavior deficits, as well as the evidence presented by the State, including Henderson's collection of novels, his neat and correctly-spelled commissary request sheets, his inmate request reports, and his extensive, handwritten

No. 14-70001

football betting sheets in which he "kept a meticulous record of college and pro football games, the scores, his bets, and whether he had won or lost." *Id.* (Cochran, J., concurring). In a footnote, the concurring opinion observed that Henderson had won more than he lost. *Id.* at *3 n.5 (Cochran, J., concurring). The concurring opinion concluded:

> Although there was evidence in this record indicating that applicant was mentally retarded, there was also significant evidence showing that he was not. Either finding is supportable by the record evidence. But as a reviewing court, only reading the record, we must be especially deferential to the trial judge's factual findings, especially because he presided over both the original trial and the habeas hearing. He was able to make credibility and demeanor determinations of the witnesses and of applicant's courtroom actions and demeanor that we are not capable of making on habeas review.

*Id.* at *4 (Cochran, J., concurring).

On March 6, 2006, Henderson filed in this Court a motion for authorization to file a successive federal habeas application. This Court granted authorization on August 23, 2006, but noted that Henderson's successive petition would be time-barred unless the doctrine of equitable tolling applied. *In re Henderson*, 462 F.3d 413, 417 (5th Cir. 2006).

Henderson filed his successive federal habeas petition on August 24, 2006. The district court denied relief on March 31, 2008, holding that Henderson's petition was barred by the statute of limitations and that Henderson was not entitled to equitable tolling. The district court granted a COA and Henderson appealed. On November 16, 2010, this Court vacated the district court's judgment and remanded to the district court for further consideration of its holding on equitable tolling in the light of *Holland v. Florida*, 560 U.S. 631 (2010). *Henderson v. Thaler*, 626 F.3d 773, 781 (5th Cir. 2010).

No. 14-70001

On remand, after receiving additional briefing, the district court held that Henderson was entitled to equitable tolling, but that Henderson had not shown that he is entitled to federal habeas relief on his *Atkins* claim, stating that, "[o]verall, Henderson failed to show that the State court's findings . . . were objectively unreasonable.  At best, Henderson has only shown that fairminded jurists could disagree about the correctness of the State court's decision; thus, the decision was not unreasonable."  The district court, sua sponte, granted a certificate of appealability (COA) "on the question of whether Henderson has satisfied his burden under § 2254(d) of showing that he is not eligible for the death penalty."

On October 11, 2013, Henderson filed a motion to vacate the district court's judgment under Federal Rule of Civil Procedure 59(e).  He argued that the district court had failed to address ASSESSMENT OF CHILDREN, which was critical evidence because it demonstrated that Dr. Gillhausen's testimony was false and misleading.  The district court denied the motion.  The district court also denied Henderson's motion to stay and abey so that the TCCA could revisit its denial of relief.

On October 14, 2013, Henderson filed in the TCCA a suggestion that the court reconsider, on its own initiative, the denial of relief on his *Atkins* claim. The TCCA denied the suggestion for reconsideration on February 26, 2014.  *Ex parte Henderson*, No. WR-37,658–03, 2014 WL 837136 (Tex. Crim. App. Feb. 26, 2014) (unpublished).  Three judges dissented, stating that "the risk that our original disposition of the applicant's *Atkins* claim was incorrect is sufficiently dire as to merit another look."  *Id*. at \*1 (Price, J., dissenting).  The dissenters stated that Henderson's "*Atkins* claim presents an even closer question than we thought it did in 2006," and thus were "persuaded that the probability that [the court] reached an incorrect conclusion on original submission is sufficiently substantial that [they] would take the admittedly

13

No. 14-70001

extraordinary step of agreeing to reconsider on [their] own motion [their] disposition of the applicant's initial *Atkins* writ application." *Id.* at \*4 (Price, J., dissenting).

## II.

The district court's grant of a COA to Henderson gives this Court jurisdiction to review the claim certified by the district court. *See* 28 U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003). "In an appeal of the district court's denial of habeas relief, this court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standard of review that the district court applied to the state court decision." *Roberts v. Thaler*, 681 F.3d 597, 603 (5th Cir. 2012) (internal quotation marks and citations omitted).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), §§ 101-108, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. §§ 2244, 2253–2266), provides that a district court may not grant habeas relief with respect to any claim that was adjudicated on the merits in the state court proceedings, unless the state court's denial of relief

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The state court's factual findings are presumed to be correct unless a petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

14

No. 14-70001

A.

1.

Henderson argues that the state court's decision is not entitled to any deference under AEDPA because the state trial court violated due process by: (1) denying his motion for discovery, thereby depriving him of any notice that Dr. Gillhausen would rely on ASSESSMENT OF CHILDREN or misapply the concepts of reliability and validity when testifying about his IQ score of 83 on the short-form WAIS-R; (2) violating his statutory right under Texas Code of Criminal Procedure article 11.071, section 9, to receive a transcript of the *Atkins* hearing within 30 days and thereafter to file proposed findings of fact and conclusions of law; and (3) granting him leave to submit briefing concerning Dr. Gillhausen's testimony and ASSESSMENT OF CHILDREN, but then ruling on his claim before the brief was submitted. Henderson contends that as a result of these violations of due process by the trial court, the TCCA did not have the necessary information to accurately assess the impact of Dr. Gillhausen's testimony and the falsity of Dr. Gillhausen's opinion about the alleged validity of the estimated 83 IQ. Henderson also complains about the state court's failure to make specific findings with respect to the book, ASSESSMENT OF CHILDREN, and the testimony of lay witnesses who knew him as a child.

The State responds that the state trial court held an evidentiary hearing at which Henderson, with the assistance of counsel, presented testimony, introduced evidence, and cross-examined the State's witnesses. According to the State, the state court's alleged failure timely to provide a copy of the transcript or a chance to submit proposed findings of fact and conclusions of law did not violate Henderson's right to due process because he had a full and fair opportunity to develop his claim. The State asserts that the lack of express findings about ASSESSMENT OF CHILDREN and the testimony of Dr. Gillhausen

15

No. 14-70001

and Henderson's lay witnesses does not affect our standard of review because state court findings of fact are presumed correct, whether they are express or implied, and the ultimate question of unreasonableness applies to the state court's decision, not to its reasoning or opinion.

2.

A state court violates due process if it dismisses a prima facie valid *Atkins* claim without giving the petitioner an adequate opportunity to develop the claim, and such a due process violation constitutes an unreasonable application of clearly established federal law that is sufficient to deprive the state court's decision of AEDPA deference. *Blue v. Thaler*, 665 F.3d 647, 656–57 (5th Cir. 2011); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010); *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007); *see also Hall v. Florida*, 134 S. Ct. 1986, 2001 (2014) (stating that persons facing the death penalty "must have a fair opportunity to show that the Constitution prohibits their execution"). However, "infirmities in state habeas proceedings do not constitute grounds for federal habeas relief." *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (internal quotation marks and citation omitted). *Atkins* recognizes "a liberty interest that entitles the petitioner to a set of core procedural due process protections: the opportunity to develop and be heard on his claim that he is ineligible for the death penalty." *Blue*, 665 F.3d at 657. The requirement of "core procedural due process protections" does not deprive states of "discretion to set gateways to full consideration and to define the manner in which habeas petitioners may develop their claims." *Id.* To strip a state court's determination of AEDPA deference, the petitioner must show that the state court failed "to provide petitioner with the opportunity to develop his claims." *Tercero v. Stephens*, 738 F.3d 141, 148 (5th Cir. 2013) (internal quotation marks and brackets omitted).

16

No. 14-70001

We hold that Henderson has not demonstrated that the state courts deprived him of an adequate opportunity to develop his *Atkins* claim. Accordingly, there was no violation of his due process rights. The state trial court conducted an evidentiary hearing at which Henderson was allowed to introduce evidence through live testimony, affidavits, and exhibits, and to cross-examine the State's witnesses. Henderson has not explained why, despite the lack of a transcript of the hearing, he could not have brought to the trial court's attention the alleged errors in Dr. Gillhausen's testimony about the validity of the 83 IQ score obtained by Gilliland. The TCCA considered the trial court's proposed findings of fact and conclusions of law, together with the record, before denying his claim on the merits. The state court's decision is therefore entitled to AEDPA deference and we now turn to consider whether Henderson has shown that the state court unreasonably determined that he is not intellectually disabled.

B.

1.

Whether a petitioner is intellectually disabled is a question of fact. *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010). Because the state court's decision that Henderson failed to prove that he is intellectually disabled is entitled to AEDPA deference, Henderson cannot obtain federal habeas relief on this claim unless he shows that the TCCA's denial of relief "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The state court's factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "We may not characterize these state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, ___ S. Ct. ___, 2015 WL 2473376, at *6 (U.S. June 18, 2015) (quoting

No. 14-70001

*Wood v. Allen*, 558 U.S. 290, 301 (2010)). "Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference." *Id*. "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood v. Allen*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).

In *Atkins*, the Supreme Court held that the Eighth Amendment prohibits the execution of intellectually disabled individuals. 536 U.S. at 321. The Court did not prescribe a standard for determining intellectual disability, but instead left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id*. at 317 (alteration in original) (internal quotation marks omitted).

The TCCA established the standard for determining whether a person is intellectually disabled, and therefore ineligible for the death penalty, in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). The TCCA looked to the definitions of intellectual disability "set out by the American Association on Mental Retardation (AAMR), and [the definition] contained in section 591.003(13) of the Texas Health and Safety Code." *Id*. at 7. Both of those sources use a three-prong test for intellectual disability: (1) significantly sub-average intellectual functioning; (2) deficits in adaptive behavior; and (3) onset before age 18. *Id*. The court held that the standard it adopted would apply unless the Texas Legislature adopts an alternative statutory definition for use in capital cases. *Id*. at 8. Under Texas law, the defendant must show, by a preponderance of the evidence, that he is intellectually disabled. *Id*. at 12. "To make that showing, he must satisfy all three elements of the *Briseno* test." *Blue*, 665 F.3d at 662.

Henderson argues that the state court's determination of the facts was unreasonable because the trial court made no findings regarding ASSESSMENT

18

No. 14-70001

OF CHILDREN and the testimony of the three lay witnesses who had known Henderson as a child, and because the state court unreasonably relied on Dr. Gillhausen's allegedly inaccurate testimony, which the court had deprived Henderson of the opportunity meaningfully to rebut. He asserts that he proved by clear and convincing evidence that he satisfied all three elements of the *Briseno* test. We hold that Henderson has not shown that the TCCA unreasonably determined that he did not prove by a preponderance of the evidence that he satisfied *Briseno*'s test for adaptive behavior deficits. Accordingly, it is not necessary for us to address Henderson's arguments that the state court's findings on significantly subaverage intellectual functioning and onset before age 18 are unreasonable.

2.

"[A]daptive behavior means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." *Briseno*, 135 S.W.3d at 7 n.25 (internal quotation marks omitted). The AAMR identifies ten adaptive skill areas: "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3 (internal quotation marks omitted). A person must have deficits in at least two of these skill areas in order to meet the AAMR diagnostic criteria for adaptive behavior deficits. *Matamoros v. Stephens*, 783 F.3d 212, 217 (5th Cir. 2015). In *Briseno,* the TCCA stated that Texas courts would use the AAMR definitions, but noted that "[t]he adaptive behavior criteria are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases." *Briseno*, 135 S.W.3d at 8; *see also Ex parte Cathey*, 451 S.W. 3d 1, 19 (Tex. Crim. App. 2014) (observing that "[b]oth experts and those answering questions about a person's adaptive functioning may exhibit significant conscious or unconscious bias in addressing

this issue"). The court in *Briseno* listed some "evidentiary factors" to be considered by the trier of fact:

> [1] Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?
>
> [2] Has the person formulated plans and carried them through or is his conduct impulsive?
>
> [3] Does his conduct show leadership or does it show that he is led around by others?
>
> [4] Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
>
> [5] Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
>
> [6] Can the person hide facts or lie effectively in his own or others' interests?
>
> [7] Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8–9. The TCCA stated that, "[a]lthough experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for [intellectual disability], the ultimate issue of whether this person is, in fact, [intellectually disabled] for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility." *Id.* at 9. The TCCA reiterated that admonition in *Ex parte Cathey*:

> [C]ourts should not become so entangled with the opinions of psychiatric experts as to lose sight of the basic factual nature of the *Atkins* inquiry: Is this person capable of functioning adequately in his everyday world with intellectual understanding

and moral appreciation of his behavior wherever he is?  Or is he so intellectually disabled that he falls within that class of [intellectually disabled] inmates who are exempt from the death penalty?  In that inquiry, we should not turn a blind eye to the inmate's ability to use society and his environment to serve his own needs.  And sound scientific principles require the factfinder to consider *all* possible data that sheds light on a person's adaptive functioning, including his conduct in a prison society, school setting, or "free world" community.

451 S.W.3d at 26–27.

As we have noted, Dr. Rosin, Henderson's expert, concluded that Henderson has a low adaptive level of functioning, with deficits in self-direction and in work, safety, and academic skills.  The state habeas court found that Dr. Gillhausen's testimony about the adequacy of Henderson's academic skills and his testimony that Henderson was not a safety risk to himself to be more credible than Dr. Rosin's assessment of Henderson's adaptive deficits.  The court concluded that Henderson failed to prove that he has significant limitations in at least two adaptive skill functioning categories. The TCCA adopted the state habeas court's findings and conclusions with respect to adaptive behavior deficits.

Henderson argues that the trial court's findings on adaptive functioning improperly focus on his abilities, rather than his deficits, and are based on unscientific observations and stereotypes.  According to Henderson, the trial court's findings are based on (1) the fact that Henderson had books in his cell; (2) Dr. Gillhausen's testimony about a grievance form purportedly written by Henderson; (3) the opinion of Creea Impson, Henderson's juvenile probation officer, that, while she supervised him, Henderson was able to take care of himself, was aware of what he was doing, and wrote legible and understandable statements and letters; (4) Texas Ranger Lough's testimony that Henderson could respond rationally and on point to his questions and that, in the Ranger's view, Henderson had the mental process that involved

No. 14-70001

forethought and planning of the crime; and (5) the trial court's observation of Henderson at the *Atkins* hearing, specifically his ability to confer with counsel and look between counsel and a witness during that witness's examination. Henderson contends that the trial court's consideration of his abilities is completely at odds with the way professionals evaluate adaptive deficits. According to Henderson, limitations often co-exist with strengths, and so people who are intellectually disabled may have strengths in some adaptive skill domains, or they may have co-existing limitations and strengths within the same adaptive skill domain. He maintains that the assessment of limitations in adaptive behavior involves examining only limitations, not strengths and thus, intellectual disability can never be ruled out by determining what a person can do; it is what he cannot do that determines the correct diagnosis.

Henderson criticizes the trial court for stating that it could not "articulate with expertise a definition and identification of [intellectual disability]," but that it could "identify it when it sees it," and it did not observe intellectual disability in Henderson.  Henderson contends further that the trial court's findings on adaptive functioning were infected by its reliance on Dr. Gillhausen's inaccurate testimony about intellectual functioning.

Henderson argues that he presented clear and convincing evidence of adaptive deficits:   Reverend Milton Glass, a teacher at Henderson's elementary school who met Henderson when he was five or six years old, testified that Henderson was in special education, his grooming and dress were not age-appropriate, he had difficulty with social interaction, he had low self-esteem, and he was very gullible.  Altis Rutherford and Allegra Deloney, who were Henderson's classmates, testified that he was in special education, that his personal hygiene was not age appropriate, that he often came to school smelling like urine, that his verbal skills were delayed, that he had low self-

esteem, and that he was very gullible. Rutherford also testified that she did not believe Henderson had the ability to perform academically.

Henderson asserts that the adaptive deficits about which the lay witnesses testified are confirmed by Dr. Rosin's testing. On the Vineland Adaptive Behavior Scales, Henderson scored 34 on Communication, 67 on Daily Living, and 50 on Socialization. Based on these scores, Dr. Rosin concluded that Henderson falls around or below the first percentile when his scores are compared to those of a normative sample. Dr. Rosin concluded that Henderson has a "low" level of adaptive functioning, with age equivalent scores ranging from 7 years-6 months to 11 years, and deficits in self-direction, work skills, safety, and academic skills.

Henderson contends further that the trial transcript contains evidence supporting a finding of deficits in adaptive functioning, because the facts of the crime confirm that he acted impulsively, was a follower, did not plan the crime, and did not act rationally throughout and after the crime.

Henderson contends that it was unreasonable for the trial court to rely on Impson's testimony that Henderson was able to take care of himself and was aware of what he was doing. Henderson points out that Impson saw him for about an hour a week when he was 15 or 16 years old, but didn't remember the number of weeks she met with him. He contends further that some of her testimony supports Dr. Rosin's finding of adaptive deficits: his discharge from a boys' ranch with a very structured regime because he was unable to follow the rules, his susceptibility to negative influences of others, and her observation that Henderson's reading and math abilities were not inconsistent with those of a person operating at a fourth grade level. Henderson also asserts that Impson's testimony was directly contradicted by the testimony of the three lay witnesses who had substantial dealings with Henderson during his childhood. He contends that because the trial court ignored those witnesses'

testimony regarding Henderson's adaptive behavior deficits and failed to make any findings about this testimony that contradicted the State's evidence, the state court's findings on adaptive behavior deficits are unreasonable, and this Court should not defer to them.

Henderson argues that his possession of Tom Clancy and Stephen King novels does not suggest that he lacks adaptive functioning deficits, because there is no evidence that he read those books or, if he did, that he comprehended them beyond his level of mild intellectual disability.  He points to Dr. Rosin's testimony that Henderson's ability to read books on some level is not inconsistent with her diagnosis of a seventh grade reading level and mild intellectual disability.

Henderson attacks Dr. Gillhausen's testimony, based on a grievance form purportedly written by Henderson, that Henderson has a good vocabulary, is able to form concepts, and understands the contingencies of his behavior, on the grounds that there is no evidence that Henderson completed the grievance form without assistance, and that Dr. Gillhausen did not testify that the grievance form showed an intellectual capacity beyond a fifth-grade level.  Thus, he maintains that Dr. Gillhausen's testimony about the grievance form is consistent with Dr. Rosin's conclusions.

Henderson asserts that the trial court unreasonably relied on Dr. Gillhausen's opinion that Henderson is not intellectually disabled, which was based on Dr. Rosin's finding that he had a seventh-grade equivalent on reading and spelling.  Dr. Gillhausen testified that a mildly intellectually disabled person usually cannot score above a sixth grade level on achievement tests. Henderson asserts that Dr. Gillhausen's opinion is contrary to the medical community's treatment of adaptive functioning, which forbids rigid application of the results of a single achievement test.  Moreover, Henderson contends that consideration of his fifth-grade equivalent in arithmetic and seventh-grade

equivalent in reading and spelling is consistent with the DSM-4, which states that persons with mild intellectual disabilities can acquire academic skills up to approximately the sixth grade level.

Henderson also contends that Ranger Lough's admission that Henderson was naïve and not "smart" is consistent with Dr. Rosin's findings of adaptive deficits.

The State counters that Henderson's evidence of adaptive functioning deficits is equivocal, at best, and is therefore inadequate to demonstrate that the state court's decision is unreasonable. According to the State, the evidence shows that Henderson was not generally perceived as intellectually disabled when he was a child, that individuals who knew him as a teenager did not perceive any deficits in adaptive functioning, and that, based on his prison records, he demonstrated levels of literacy and numeracy inconsistent with intellectual disability. The State contends that Henderson's presentation of evidence that is not necessarily inconsistent with a finding of intellectual disability is not enough to establish by clear and convincing evidence that he suffers from intellectual disability, particularly in the light of the substantial contrary evidence. Thus, according to the State, Henderson cannot prove that the state court's determination was incorrect, much less that it was incorrect beyond any possibility of reasonable dispute.

The State asserts that each of Henderson's three lay witnesses gave equivocal testimony that is inconsistent with a finding of adaptive deficits. Reverend Glass testified that Henderson had difficulty with a lot of teachers and some difficulty in socialization, that he very seldom turned in homework, that he missed school more than the average student and that, on one occasion, Henderson vandalized a classroom, tearing up maps and spraying the room with a fire extinguisher. Altis Rutherford testified that other students did not refer to Henderson as "retarded," and she did not consider him to be

intellectually disabled, "just slow."  Allegra Deloney testified that Henderson was able to get along with teachers and other students, that "[i]n some areas" he was like the rest of the children, and that she did not call Henderson "retarded" when they were children.

The State maintains that Henderson's placement in special education classes as a child does not necessarily indicate intellectual disability, because there is no record that Henderson was assigned to special education classes based on a finding that he was intellectually disabled.  According to the State, there are multiple reasons other than intellectual disability that might result in assignment to special education.  It points to Dr. Gillhausen's testimony that although the most frequent reason for putting somebody in special education classes is because of a learning disability, such placement can also be based on emotional disturbance, health concerns, or bad behavior.

The State suggests that Henderson's failure to dress in an age-appropriate manner and other difficulties in school may have resulted from a lack of supervision by his mother.  It points to prison records indicating that Henderson's father died in 1976 and that he has one sister, five half-sisters, and three half-brothers (one of whom is deceased).  It also notes that Reverend Glass testified that Henderson's appearance in elementary school was not age appropriate "in some respects," such as "combing of his hair, brushing his teeth [and] [t]he way he wore his clothes," but Reverend Glass attributed this to "neglect, more."  In addition, Impson testified that Henderson did not have a lot of supervision at home and that Henderson's mother was frequently absent during scheduled home visits.  Dr. Gillhausen testified that a child's grooming and dress is more of an indicator about the parent's adaptive behavior than it is about the child's.  The State asserts that Henderson's coming to school smelling of urine may have had something to do with the fact that he grew up

in a house without running water; nevertheless, when Impson knew Henderson as a teenager, he was clean and neatly dressed.

The State points out that the record contains considerable evidence of Henderson's criminal and antisocial behavior:  he began to use marijuana at 15, and began to sell crack cocaine at 18; he has fathered three children out of wedlock by two different women; he claimed that he joined the Crips gang at age 19, after being initiated by robbing a convenience store; and before his capital murder conviction, Henderson had been confined to juvenile detention in Oklahoma for burglary, to jail in Oklahoma for burglary of a habitation, to jail in Dallas County for aggravated robbery, and to Oklahoma State Prison for auto theft and burglary.

The State asserts that the evidence of Henderson's mathematic ability further undercuts a finding of adaptive deficits:  (1) Dr. Rosin testified that Henderson can do addition, subtraction, and some multiplication; (2) Henderson's commissary requests demonstrate that that he can multiply the per unit cost by the number requested and obtain the correct total cost; and (3) handwritten football betting sheets found in Henderson's cell reflect not only that he could keep track of a substantial number of games, but also that he understood betting lines (the number of points by which particular teams were favored).

The State asserts that Henderson's claim of adaptive functioning deficits is also undermined by his possession of more than 40 books, including novels, a dictionary, a Bible, and three personal journals.  Although Henderson dismisses that evidence on the ground that there was nothing to indicate that he read or understood the books, the State points out that there is also no evidence that he did not read them, and it argues that his possession of dozens of books, together with his report to Dr. Rosin that he "spends a majority of his time in prison reading a Bible and/or writing notes to his family," suggests a

level of literacy beyond that of an intellectually disabled person.  The State calls attention to Dr. Gillhausen's testimony that very few individuals with an IQ of 66 can read, and to Dr. Rosin's testimony that the books in Henderson's cell were "about six to—seventh to twelfth grade level, if you're reading them."

The State contends that the evidence of Henderson's writing ability also undermines his claim of adaptive functioning deficits:  (1) Impson's testimony that he wrote long statements for her about things that he had done, and also wrote rational letters to victims; (2) a grievance form that Henderson completed on May 15, 2002, using words such as "resolve, usually, grievance, warning, serious, manner, consequences, and avoid," which demonstrates an understanding of concepts such as fairness, the need to follow procedures, and the consequences of his actions; and (3) Dr. Gillhausen's testimony that in his opinion, the grievance form indicated that Henderson is not intellectually disabled.

The State asserts that the record also contains evidence that Henderson was able to lie effectively, which further undermines his claim of adaptive functioning deficits:  (1) Texas Ranger Roger Lough, who transported Henderson from Dallas in October 1993, testified that Henderson identified himself as "Johnny Mack," and  Henderson was also known as James Lee Riles, Johnny Leon Mack, and J-Dog, the last of which is tattooed on his upper left arm; (2) in his initial death row assessment interview with Gilliland, Henderson denied ever having been in special education, and he stated that "one of the others shot the woman;" and (3) other prison records indicate that Henderson claimed "he did not shoot the victim, that his cousin shot her."[3]

---

[3] Henderson replies that his interactions with the Dallas Police Department—calling the police to report "his mother's" (the victim's) car missing and volunteering that he had a gun in his pocket (a recent murder weapon)—confirm that he lacked the guile to lie effectively.

No. 14-70001

Henderson discounts all of this evidence of his abilities, asserting that an assessment of limitations in adaptive functioning "involves examining *limitations*, not *strengths*. . . . Thus, intellectual disability can never be ruled out by determining what a person *can* do—it is what he or she *cannot* do that determines the correct diagnosis." Henderson maintains that his perceived abilities mirror those of, at most, an adolescent, which is consistent both with Dr. Rosin's evaluation of Henderson and with his pre-*Atkins* achievement testing.

We hold that Henderson has not met his burden of showing that the TCCA was unreasonable in concluding that he did not meet his burden of proving, by a preponderance of the evidence, that he has adaptive behavior deficits as defined in *Briseno*. This Court has held that *Briseno* is a constitutionally permissible interpretation and application of *Atkins*. *See Matamoros*, 783 F.3d at 218; *Lewis v. Thaler*, 701 F.3d 783, 793 (5th Cir. 2012); *Chester v. Thaler*, 666 F.3d 340, 346–47 (5th Cir. 2011). This Court has also held that the Supreme Court's rejection of Florida's use of a strict 70-point IQ cut-off, on the ground that Florida's test "disregards established medical practice," *Hall v. Florida*, 134 S. Ct. 1986, 1995 (2014), does not call into question the constitutionality of the *Briseno* standard. *See Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 951 (2015). Likewise, the Court's recent opinion in *Brumfield v. Cain,* 2015 WL 2473376 (holding that the state court unreasonably determined that the petitioner failed to make the showing of intellectual disability and adaptive impairment necessary to obtain an evidentiary hearing), does not cast any doubt on the constitutionality of the *Briseno* standard. Unlike the petitioner in *Brumfield*, Henderson had an evidentiary hearing at which he presented expert testimony and other evidence in support of his *Atkins* claim.

No. 14-70001

Under *Briseno*, the TCCA was free to weigh *all* of the evidence, not just the evidence of Henderson's limitations and Henderson's expert witness's testimony, in making its factual determination that Henderson failed to meet his burden of proof. As the TCCA concurring opinion noted, although there was evidence in this record indicating that Henderson is intellectually disabled, there was also significant evidence that he is not. The TCCA deferred to the credibility and demeanor determinations of the trial judge, who presided over both the original trial and the habeas hearing. Considering all of the evidence presented at the *Atkins* hearing, which we have described above, it was not unreasonable for the TCCA to conclude that Henderson failed to show, by a preponderance of the evidence, that he satisfied the *Briseno* test for adaptive behavioral deficits. We therefore AFFIRM the district court's denial of federal habeas relief.

AFFIRMED.